**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 22, 2011

No. 10-41108

Lyle W. Cayce
Clerk

BUFFALO MARINE SERVICES INCORPORATED; LIMIT (NO 2)
LIMITED; NEW YORK MARINE & GENERAL INSURANCE COMPANY,

Plaintiffs-Appellants

v.

UNITED STATES OF AMERICA,

Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, Chief Judge, and HIGGINBOTHAM and SOUTHWICK, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal arises out of an oil spill on the Neches River. Appellants
challenge the National Pollution Funds Center's final claim determination
denying reimbursement for costs arising from the spill.  The district court
rejected appellants' challenge to the agency's claim determination. We affirm.

**I.**

In August 2004, a barge and a tug owned by appellant Buffalo Marine
Services, Inc. ("Buffalo Marine") attempted to dock alongside the TORM MARY,
a large tanker ship, in order to deliver fuel that had been ordered by entities

No. 10-41108

responsible for the tanker ship (collectively, "the Torm"). The fuel delivery never took place. Buffalo Marine's barge collided with the TORM MARY, rupturing the vessel's skin and adjacent fuel-oil tank. As a result of the rupture, approximately 27,000 gallons of heavy fuel oil spilled into the Neches River. Buffalo Marine, the Torm, and their insurers coordinated the clean-up effort, assessed at a cost of $10.1 million.

The Oil Pollution Act of 1990 ("OPA") creates a strict-liability scheme for the costs of cleaning up oil spills: "each responsible party for a vessel . . . from which oil is discharged . . . is liable for the removal costs and damages . . . that result from such incident."[1] The "responsible party" for a vessel is "any person owning, operating, or demise chartering the vessel."[2] The liability of the responsible party is capped at a dollar limit that is set by statute; the limit is based on the gross tonnage of the responsible party's vessel.[3] If the cleanup costs exceed the statutory limit, the responsible party can seek to have those excess costs reimbursed by the Oil Spill Liability Trust Fund.[4] In this case, because the oil spilled from the TORM MARY, the Torm was the "responsible party" under the OPA's strict liability scheme.

However, a responsible party may have a complete defense to liability under § 2703(a)(3) if it "establishes, by a preponderance of the evidence," that the oil spill was "caused solely by . . . an act or omission of a third party, other than . . . a third party whose act or omission occurs in connection with any contractual relationship with the responsible party."[5] Section 2703(a)(3) also

---

[1] 33 U.S.C. § 2702(a).

[2] *Id.* § 2701(32)(A).

[3] *See id.* § 2704(a)(1)–(2).

[4] *See id.* §§ 2708, 2013.

[5] *Id.* § 2703(a)(3).

2

No. 10-41108

requires a showing that the responsible party exercised due care with respect to the spilled oil and that it took precautions against the foreseeable acts or omissions of the third party to whom it is attempting to shift liability.[6]

On March 16, 2007, the owners and insurers of the three vessels involved in the spill jointly submitted a request for reimbursement of their cleanup expenses to the Coast Guard's National Pollution Funds Center ("NPFC"), which is the agency charged with administering the Oil Spill Liability Trust Fund.[7] The request sought to declare Buffalo Marine the sole "third-party" cause of the spill, exonerate the Torm, substitute Buffalo as the formal "responsible party" for cleanup costs, and limit Buffalo Marine's liability to $2 million – the approximate value of the barge – pursuant to the OPA.[8]

On November 8, 2007, the NPFC denied the claim, concluding that the claimants had not established by a preponderance of evidence that Buffalo Marine's acts were not "in connection with any contractual relationship with the responsible party." The NPFC denied the claimants' motion for reconsideration of its decision. Buffalo Marine and its insurers then sought review of the NPFC's decision in the district court. After the parties filed cross-motions for summary judgment, the district court granted the government's motion for

---

[6] *Id.* § 2703(a)(3)(A)–(B).

[7] *See United States v. Ex-USS CABOT / DEDALO*, 297 F.3d 378, 380 n.2 (5th Cir. 2002) (citing 33 U.S.C. § 1321(s)); 40 C.F.R. § 300.5, at 12.

[8] The TORM MARY is much larger than the barge and hence would have been liable for the first $36 million of clean-up costs, an amount far in excess of the $10.1 million that the Torm and Buffalo Marine allege was spent on clean-up. Because the OPA allows a responsible party to bring a civil action for contribution against any other person who shares responsibility for the spill, *see* 33 U.S.C. § 2709, Buffalo Marine likely would have faced liability for its role in the spill even if the Torm had not submitted a third-party affirmative defense claim to the NPFC. But if the NPFC had granted the claimants' request to substitute Buffalo Marine as the "responsible party," it would have then reimbursed Buffalo Marine for approximately $8.1 million of the $10.1 million the claimants purportedly spent on the cleanup.

No. 10-41108

summary judgment and denied the plaintiffs' motion for summary judgment. Buffalo Marine and its insurers timely appealed.

## II.

At the heart of this case are the contractual relationships formed in the course of the transaction through which the Torm purchased the fuel that was being delivered when the spill occurred and through which Buffalo Marine attempted to deliver the fuel to the TORM MARY. Four parties were involved in the fuel-purchase transaction: the Torm, the end buyer of the fuel; Bominflot, Inc. ("Bominflot"), the seller of the fuel; LQM Petroleum Services, Inc. ("LQM"), the broker that acted as an intermediary between the Torm and Bominflot; and Buffalo Marine, the delivery agent hired by Bominflot to deliver the fuel to the Torm.

Appellants argue that the NPFC's decision should be overturned, and the district court reversed, because the Torm and Buffalo Marine did not have a "contractual relationship" and because the Torm satisfied the other elements of its third-party defense. The government argues that the Torm and Buffalo Marine had at least an indirect contractual relationship and that the acts that allegedly caused the spill occurred in connection with that contractual relationship, precluding a successful third-party affirmative defense under § 2703(a)(3). Alternatively, the government argues that if this court rejects its position, we should remand the case to the agency so that it can determine whether the Torm satisfies the other elements of its defense.

## III.

We review a grant of summary judgment *de novo*, applying the same standard as the district court.[9] The Administrative Procedure Act ("APA") allows a federal court to overturn an agency's ruling "'only if it is arbitrary,

---

[9] *Wilson v. Sec'y, Dept. of Veterans Affairs*, 65 F.3d 402, 403 (5th Cir. 1995).

4

No. 10-41108

capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole.'"[10] The court starts from "a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous."[11] The agency's factual findings are reviewed to determine only "whether they are supported by substantial evidence."[12] The agency's legal conclusions are reviewed *de novo*, except for questions of statutory interpretation, where the court owes "substantial deference to an agency's construction of a statute that it administers."[13] Review is "highly deferential to the administrative agency whose final decision is being reviewed."[14]

## IV.

This case turns on two issues: (1) whether the NPFC's interpretation of 33 U.S.C. § 2703(a)(3) deserves deference and (2) whether the NPFC's determination in this case, given the NPFC's interpretation of the statute, was arbitrary, capricious, not in accordance with law, or unsupported by substantial evidence. Because we find that the agency's interpretation of the statute is entitled to deference and that its determination that the Torm is not entitled to a third-party defense was not arbitrary, capricious, or otherwise unreasonable, we need not reach the other arguments raised by the parties.

---

[10] *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

[11] *Id.*

[12] *See Alwan v. Aschcroft*, 388 F.3d 507, 510–11 (5th Cir. 2004).

[13] *Id.* at 511 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).

[14] *Tex. Clinical Labs*, 612 F.3d at 775.

No. 10-41108

## A.

We first consider whether the NPFC's interpretation of the OPA deserves deference. To determine whether a "responsible party" is entitled to a complete defense based on the act or omission of a third party, the NPFC must evaluate whether the alleged third-party "act or omission occur[red] in connection with any contractual relationship with the responsible party."[15] The NPFC interprets the phrase "act or omission occur[ring] in connection with any contractual relationship" to include acts or omissions occurring in connection with an indirect contractual relationship with the responsible party. Thus, the NPFC has concluded that the phrase includes acts occurring in connection with a commercial fuel delivery even where "a chain of agents or contracts stands between the party delivering the fuel and the party receiving the fuel."[16] Direct privity of contract is not required.

Deference to an agency's interpretation of a statute "is governed by the classic two-step framework from *Chevron USA v. Natural Resources Defense Council, Inc.*: If Congress 'has directly spoken to the precise question at issue,'" the reviewing court "'must give effect to [Congress's] unambiguously expressed intent,'" but "'if the statute is silent or ambiguous,'" the court "must defer to the agency's interpretation so long as it is 'based on a permissible construction of the statute.'"[17]

At *Chevron* step one, Congress has not spoken directly to the precise question at issue. Although the OPA states that "[f]or purposes of subsection (a)(3) . . . the term 'contractual relationship' *includes, but is not limited to*, land contracts, deeds, easements, leases, or other instruments transferring title or

---

[15] 33 U.S.C. § 2703(a)(3).

[16] Appellants' Br. at 19.

[17] *Tex. Clinical Labs*, 612 F.3d at 775 (citation omitted) (quoting *Chevron*, 467 U.S. at 842-43).

No. 10-41108

possession,"[18] with certain exceptions not applicable here, it does not explicitly define the phrase "any contractual relationship." In addition, the statute does not specify whether a third party must be in direct privity of contract with the responsible party for an act or omission of the third party to occur "in connection with [a] contractual relationship with the responsible party."[19] "Nor is its language so clear as to only permit a single interpretation."[20] Therefore, we proceed to *Chevron* step two.

At *Chevron* step two, we find that the NPFC's interpretation of the phrase "in connection with any contractual relationship with the responsible party" is based on a permissible construction of § 2703(a)(3) for at least four reasons.

First, appellants' argument that the NPFC's interpretation does not deserve deference presumes that the phrase "contractual relationship" is interchangeable with the term "contract." While the drafters of the statute could have used the phrase "in connection with a contract between the responsible party and the third party," they did not do so. The exception to the general rule of strict liability for the party responsible for the vessel that spilled the oil applies where the spill resulted from "an act or omission of a third party, other than . . . a third party whose act or omission occurs in connection with any *contractual relationship* with the responsible party (except where the sole contractual arrangement arises in connection with carriage by a common carrier by rail)."[21] The adjective "contractual" is not defined by the OPA. *Webster's Collegiate Dictionary* defines "contractual" as "of, relating to, or constituting a

---

[18] 33 U.S.C. § 2703(d)(1) (emphasis added).

[19] *Id.* § 2703(a)(3).

[20] *Tex. Clinical Labs*, 612 F.3d at 775.

[21] 33 U.S.C. § 2703(a)(3).

No. 10-41108

contract."[22]   While some contractual relationships are themselves contracts, other contractual relationships merely relate to contracts.  The fact that no contract exists between two parties does not preclude the parties from having a "contractual" relationship.  The language used to describe the exception-to-the-exception to the defense – "except where the sole *contractual arrangement* arises in connection with carriage by a common carrier by rail" – reinforces the inference that Congress chose not to limit the exception to the third-party defense to cases in which there was a contract between the responsible party and the third party.

Second, the statute specifies that the third-party defense does not apply where the third party's act or omission occurred "in connection with *any* contractual relationship with the responsible party."  If the word "any" is given its ordinary meaning, the phrase "any contractual relationship" must encompass all varieties of contractual relationships.[23]  We find no reason to conclude that the phrase "any contractual relationship" excludes indirect contractual relationships.  Indeed, in a third-party defense provision virtually identical to the one at issue here, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") specifies that the defense does not apply where the third party's "act or omission occurs in connection with *a*

---

[22] *Merriam Webster's Collegiate Dictionary* (10th ed. 1996).  This court has noted that "dictionaries are a principal source for ascertaining the ordinary meaning of statutory language." *United States v. Orellana*, 405 F.3d 360, 365 (5th Cir. 2005) (quotation marks, alteration, and citation omitted).

[23] *See Mocklin v. Orleans Levee Dist.*, 877 F.2d 427, 429 (5th Cir. 1989) (noting that in *United States v. James*, 478 U.S. 597, 604 (1986), the Supreme Court gave "[t]he use of the words 'any damage' [in 33 U.S.C. § 702c] . . . a meaning consistent with the ordinary meaning of th[o]se words" and found that the phrase "include[s] all different kinds of damages"); *see also G.M. Trading Corp. v. Commissioner*, 121 F.3d 977, 981 (5th Cir. 1997) ("We find the use of the word 'any' to be significant."); *Rekant v. Desser*, 425 F.2d 872, 880 n.15 (5th Cir. 1970) (relying on the broad scope of the ordinary meaning of "any").

contractual relationship, *existing directly or indirectly*, with the defendant."[24] Given the common purposes and shared history of CERCLA and the OPA,[25] the use of the phrases "any contractual relationship" and "a contractual relationship, existing directly or indirectly" in parallel, similarly worded provisions is particularly significant.[26]

Third, the legislative history confirms that Congress meant to encompass indirect contractual relationships within the phrase "any contractual relationship." The version of the OPA originally passed in the House simply referred to "a contractual relationship with a responsible party."[27] The Senate version, however, copied the language used in the parallel provision in CERCLA, allowing the third-party defense where a spill resulted from "an act or omission of a third party other than . . . one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant."[28] The phrase "any contractual relationship" was added at conference. The conference report explains:

> The Conference substitute adopts the Senate language on complete defenses to liability. The substitute refers to any contractual arrangement rather than direct or indirect contractual relationships

---

[24] 42 U.S.C. § 9607bd)(3) (emphasis added).

[25] *See, e.g.*, *GE v. United States DOC*, 128 F.3d 767, 769-70 (D.C. Cir. 1997) (noting that prior to passage of the OPA, "natural resource damages resulting from oil spills were assessed pursuant to [CERCLA]").

[26] *Cf. Int'l Marine Carriers v. Oil Spill Liability Trust Fund*, 903 F. Supp. 1097, 1105 (S.D. Tex. 1994) (noting that "[t]he OPA section 2703(a)(3) defense is analogous to the CERCLA section 9607(b)(3) third-party defense" and concluding that the agency's broad interpretation of the phrase "any contractual relationship" was based on a permissible construction of § 2703(a)(3)).

[27] Oil Pollution Act of 1989, H.R. 1465, 101st Cong., § 1003(a)(2)(C) (as passed by the House, Nov. 9, 1989).

[28] Oil Pollution Liability and Compensation Act of 1989, H.R. 1465, 101st Cong., § 102(b)(1)(C) (as passed by the Senate, Nov. 19, 1989).

as referred to in the Senate amendment and to responsible party rather than defendant as in the Senate amendment.[29]

In other words, although the final version of the OPA substituted the phrase "any contractual relationship" for the phrase "a contractual relationship, existing directly or indirectly," Congress's use of "any contractual relationship" reflected the adoption of the Senate version of the third-party defense provision, which emphasized the breadth of the "contractual relationship" limitation.

Appellants suggest that the revision of 33 U.S.C. § 2703 in 2004 to include a definition of "contractual relationship" cuts against an inference that Congress intended to impose a broad "contractual relationship" limitation to the third-party defense. However, the "Definition" merely specifies that "the term 'contractual relationship' . . . *includes, but is not limited to,* land contracts, deeds, easements, leases, or other instruments transferring title or possession."[30] This definition replicates the definition of "contractual relationship" that appears in CERCLA.[31] If the definition were meant to exclude indirect contractual relationships, then Congress would not have provided, in CERCLA, that the third-party defense does not apply where the third party's act or omission "occurs in connection with a contractual relationship, existing directly or indirectly."[32] The amendment to § 2703, passed as part of the Coast Guard and Marine Transportation Act of 2004, reinforces the inference that Congress intended the "contractual relationship" limitation to the third-party defense

---

[29] H.R. REP. NO. 101-653, at 5 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 782-83.

[30] 33 U.S.C. § 2703(d)(1) (emphasis added).

[31] *See* 42 U.S.C. § 9601(35)(A) ("The term 'contractual relationship[,'] for the purpose of section 9607(b)(3) of this title, includes, but is not limited to, land contracts, deeds, easements, leases, or other instruments transferring title or possession . . . .").

[32] *Id.* § 9607(b)(3).

No. 10-41108

available under the OPA to be as broad in scope as CERCLA's limitation.[33]

Fourth, allowing responsible parties to escape liability even when the third party's act was in connection with an indirect contractual relationship with the responsible party would risk allowing the exception (the third-party defense) to swallow the rule (strict liability for the vessel discharging the oil). To determine the meaning of a statute, "we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."[34] As the district court observed, the interpretation advocated by appellants "would allow contracting parties in cases such as this to avoid liability by the simple expedient of inserting an extra link or two in the chain of distribution."[35] The NPFC's understanding of the third-party defense as inapplicable where the third party's act or omission occurs in connection with an indirect contractual relationship with the responsible party is consistent with the strict liability policy at the center of the statutory scheme.[36]

---

[33] *See* Coast Guard and Marine Transportation Act of 2004, Pub. L. No. 108-293, § 703(c), 108 Stat. 1028, 1072 (2004). The conference report states:

> The purpose of [Section 703] is to provide to innocent purchasers, municipalities and lenders the same protection against liability from oil discharges under the Oil Pollution Act of 1990 as are provided for such entities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended. To the extent that differences in the language exist, these are either technical in nature or were necessary to fit with the terminology used in the Oil Pollution Act.

H.R. REP. NO. 108-617, at 82 (2004) (Conf. Rep.), *reprinted in* 2004 U.S.C.C.A.N. 936, 963.

[34] *Crandon v. United States*, 494 U.S. 152, 156-58 (1990).

[35] *Buffalo Marine Servs. Inc. v. United States*, No. 1:09-cv-01013-RC, at 12 (E.D. Tex. Oct. 13, 2010).

[36] *Cf. United States v. LeBeouf Bros. Towing Co.*, 621 F.2d 787, 789 (5th Cir. 1980) (endorsing a narrow interpretation of the third-party defense in the Federal Water Pollution Control Act (Clean Water Act) in part because "[t]he statute's comprehensive scheme for preventing and cleaning up oil spills would be undermined if barge owners like LeBeouf could escape strict liability merely by hiring out their operations to tugs and independent

11

No. 10-41108

We conclude that the NPFC's interpretation of the phrase "in connection with any contractual relationship with the responsible party" in 33 U.S.C. § 2703(a)(3) is based on a permissible construction of the statute.

## B.

Having determined that the NPFC's interpretation of the OPA is entitled to deference, we find that the agency's determination that the Torm was not eligible for the third-party defense should be upheld, as it was supported by substantial evidence and not arbitrary, capricious, or otherwise not in accordance with law.

It was the claimants' burden to establish by "a preponderance of evidence" that the Torm was entitled to a complete defense.[37]   In their claim letter, the claimants alleged that "the sole cause of the discharge at issue was the act and/or omission of [Buffalo Marine's barge], whereby it collided with [the TORM MARY], and resulted in the pollution incident."[38]  To succeed in their claim, the claimants thus had to show by a preponderance of evidence that the act or omission of the barge whereby it collided with the TORM MARY was not in connection with any contractual relationship with the Torm.[39]

Here, the e-mails and other communications exchanged among the Torm and its agents, Bominflot, and Buffalo Marine support the agency's conclusion that Buffalo Marine's tug and barge "approached the TORM MARY to perform a prearranged delivery of bunkers."[40]  The claimants acknowledged that the Torm, through its agent, contracted with Bominflot to deliver fuel bunkers to the

---

contractors").

[37] *See* 33 U.S.C. § 2703(a).

[38] Administrative Record at 277.

[39] *See* 33 U.S.C. § 2703(a)(3).

[40] Administrative Record at 268.

12

No. 10-41108

TORM MARY and Bominflot arranged for the bunkers to be delivered by Buffalo Marine's barge. Buffalo Marine and the Torm thus were linked by "a promise of bunkering services in return for payment."[41]    While the contractual relationship between the Torm and Buffalo Marine may have been an indirect one, involving a chain of intermediaries, the NPFC reasonably concluded that the arrangement whereby Buffalo Marine's barge delivered the bunkers to the TORM MARY "squarely falls under the meaning of 'any contractual relationship.'"[42]

As the NPFC noted, the record also included evidence of "a more direct aspect" to the contractual relationship between the Torm and Buffalo Marine.[43] For example, in the hours leading up to the collision, the master of Buffalo Marine's tug and the master of the TORM MARY communicated by radio to coordinate the planned delivery. In addition, as Buffalo Marine's barge and tug were approaching the TORM MARY, the TORM MARY's chief engineer was preparing the documents that the Torm and Buffalo Marine would have to sign so that the fuel-transfer operation could take place. One of these documents, mandated by 33 C.F.R. § 156.150, was a "Declaration of Inspection."[44] Though the spill prevented the parties from ever signing the declaration of inspection, by law, they could not have completed the fuel transfer without signing the

---

[41] *Id.*

[42] *Id.*; *see also id.* at 685-86 (noting that while the claimants supplemented the record on reconsideration, the NPFC still did not have "complete documentation of the chain of relationships between the various interests that arranged the bunkering operation," and finding again that it was "reasonably clear that [the] alleged third party acts were clearly in connection with a contractual relationship with the responsible parties for the TORM MARY").

[43] *Id.* at 268, 686.

[44] *Cf. Int'l Marine Carriers*, 903 F. Supp. at 1105 (finding that the Declaration of Inspection signed by the chief engineer of a vessel and the dockman at the fuel terminal was evidence of a contractual relationship between the vessel and the fuel terminal).

13

declaration.[45]  Buffalo Marine puts much stock in the fact that, because the fuel delivery was not completed, the parties never signed the declaration of inspection.  However, as the NPFC observed, the mere fact that the bunkers were not ultimately delivered "does not affect the contractual nature of the relationship [between the Torm and Buffalo Marine] as the approach and collision occurred."[46]

Given the evidence on record and the concessions of the parties, we find no error in the NPFC's conclusion that the claimants failed to establish by a preponderance of evidence that the acts or omissions of Buffalo Marine's barge in approaching and colliding with the TORM MARY were other than those occurring in connection with a contractual relationship with the responsible party for the TORM MARY.  Because the claimants failed to demonstrate by a preponderance of evidence that the sole cause of the spill was a third-party act or omission that did not occur in connection with any contractual relationship with the responsible party, the Torm's third-party affirmative defense could not succeed.  Thus, we also find no error in the NPFC's failure to decide whether the claimants could satisfy the additional requirements in § 2703(a)(3)(A) and (B).

## V.

We conclude that the NPFC's interpretation of 33 U.S.C. § 2703 is entitled to deference and that appellants have not demonstrated that the NPFC's denial of the Torm's third-party affirmative defense claim should be overturned under the standard set forth in the APA.

AFFIRMED.

---

[45] *See* 33 C.F.R. § 156.150(a) ("No person may transfer oil or hazardous material to or from a vessel unless each person in charge . . . has filled out and signed the declaration of inspection form described in paragraph (c) of this section.").

[46] Administrative Record at 268; *see also id.* at 686.