**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————

No. 16-31150

———————

UNITED STATES OF AMERICA,

United States Court of Appeals
Fifth Circuit

**FILED**
November 7, 2017

Lyle W. Cayce
Clerk

Plaintiff - Appellee

v.

AMERICAN COMMERCIAL LINES, L.L.C.,

Defendant - Appellant

———————————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————————

Before SMITH, OWEN, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

On July 23, 2008, nearly 300,000 gallons of oil spilled into the Mississippi River when a tugboat veered across the river, putting the oil-filled barge it towed into the path of an ocean-going tanker. The tugboat, the M/V MEL OLIVER, was owned by American Commercial Lines ("ACL") but operated by DRD Towing Company pursuant to a contractual agreement between the companies. As the statutorily-defined responsible party under the Oil Pollution Act ("OPA"), ACL incurred approximately $70 million in removal costs and damages. The United States also incurred approximately $20 million in removal costs and damages.

No. 16-31150

The United States initiated this action in 2014, seeking a declaration that ACL is liable for all removal costs and damages resulting from the spill and to recover the costs that it incurred. The United States moved for partial summary judgment on its claims that ACL was not entitled to any defenses to liability under OPA. The district court granted that motion, and later entered final judgment ordering ACL to pay the United States $20 million. ACL appealed. We AFFIRM.

**I**

In 2007, ACL, a marine-transportation company that operates a fleet of barges and tugboats, contracted with DRD Towing, another marine-transportation company, to operate some of its tugboats. ACL and DRD entered into two charter agreements. Under the "Master Bareboat Charter," ACL chartered several tugboats, including the M/V MEL OLIVER, to DRD for one dollar per day.[1] Under the "Master Fully Found Charter," DRD agreed to crew the tugboats and charter its services back to ACL. Both agreements required compliance with "all applicable laws and regulations [with] respect to the registration, licensing, use, manning, maintenance, and operation of the Vessel(s)."

The MEL OLIVER's crew consisted of Captain Terry Carver, Steersman John Bavaret, and two deckhands. Captain Carver was the only crewmember with a valid United States Coast Guard Master of Towing Vessels license, which authorized him to lawfully operate tugboats on the lower Mississippi River. Steersman Bavaret held only an Apprentice Mate (Steersman) license, which authorized him to serve as an apprentice mate under the direct supervision of a properly licensed master. He was not authorized to operate

---

[1] The Master Bareboat Charter specified three vessels, M/V PAM D, M/V REGINA ANN, and M/V CELESTE MCKINNEY. When the PAM D suffered an engine failure, the MEL OLIVER was substituted in its place by amendment to the initial charter.

2

the vessel without continuous supervision. *See* 46 C.F.R. § 10.107(b) (requiring that Steersman "be under the direct supervision and in the continuous presence of a master"); 46 C.F.R. § 15.401 (prohibiting mariners from serving in any positions that exceed the limits of their credentials).

On July 20, 2008, Captain Carver left the MEL OLIVER to go on shore, leaving Steersman Baravet in control of the vessel. Two days later, while—unbeknownst to ACL—Captain Carver was still on shore, ACL directed the MEL OLIVER to tow an ACL barge, the DM-932, to pick up fuel from a facility in Gretna, Louisiana. At that time, Steersman Bavaret had worked for 36 hours with only short naps, in violation of Coast Guard regulations. *See* 46 U.S.C. § 8104(h) ("[A]n individual licensed to operate a towing vessel may not work for more than 12 hours in a consecutive 24-hour period except in an emergency."); 46 C.F.R. § 15.705(d) (stating that "a master or mate (pilot)" may not work "more than 12 hours in a consecutive 24-hour period except in an emergency"). Still under Steersman Bavaret's control, the MEL OLIVER arrived at the Gretna facility around 2:00 p.m. on July 22, 2008. The DM-932 was loaded with fuel, and the MEL OLIVER departed for its return trip, with the fuel-filled barge in tow, at about 12:30 a.m. on July 23, 2008.

As the MEL OLIVER pushed the DM-932 along the Mississippi River, it began travelling erratically. At about 1:30 a.m., it turned to cross the path of an ocean-going tanker, the TINTOMARA, owned by a third party. The TINTOMARA's pilot and the Coast Guard's New Orleans Vessel Traffic Service staff attempted to hail the MEL OLIVER by radio, but no one answered. The TINTOMARA also sounded its alarm whistle. Unable to change course, the TINTOMARA collided with the DM-932. The DM-932 broke away from the MEL OLIVER and sank downriver, spilling approximately 300,000 gallons of oil into the Mississippi River. Immediately after the collision, a crewmember

on the MEL OLIVER found Steersman Bavaret slumped over the steering sticks and non-responsive.

Following the spill, the government prosecuted DRD, Captain Carver, and Steersman Bavaret for criminal violations of federal environmental law. DRD and Steersman Bavaret each pleaded guilty to one count of violating the Ports and Waterways Safety Act, 33 U.S.C. § 1232(b)(1), and one count of violating the Clean Water Act ("CWA"), 33 U.S.C. § 1319(c)(1)(A). Captain Carver pleaded guilty to one count of violating the Ports and Waterways Safety Act.

In the course of the criminal investigation, DRD admitted that it knowingly allowed its crewmembers to work without appropriate licenses or qualifications and to work more hours than were permitted under Coast Guard safety regulations and that it failed to report those "manning deficiencies" to the Coast Guard, also in violation of Coast Guard regulations. Captain Carver and Steersman Bavaret admitted to knowing that Bavaret was not licensed to act as captain in Carver's absence.

In addition to the criminal prosecution, the government sued ACL and DRD under OPA to recover clean-up costs resulting from the spill.[2] DRD promptly declared bankruptcy and later dissolved its LLC. The government moved for summary judgment against ACL on the issue of liability under OPA. The district court granted summary judgment in favor of the government, and later issued a final judgment ordering ACL to pay the government $20 million. This appeal followed.

---

[2] Related litigation came to this court in *United States v. Am. Commercial Lines, L.L.C.*, 759 F.3d 420 (5th Cir. 2014).

No. 16-31150

## II

We review a district court's grant of summary judgment de novo, applying the same legal standards as the district court. *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any reasonable inferences are to be drawn in favor of the non-moving party. *Robinson*, 505 F.3d at 366.

## III

### A

OPA was enacted in 1990 in response to the Exxon Valdez oil spill. It "was intended to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry." *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001) (citing S. REP. NO. 101-94, *reprinted in* 1990 U.S.C.C.A.N. 722, 723). OPA's cost-internalization measures, which increased the financial consequences of oil spills, were intended to "encourage greater industry efforts to prevent spills and develop effective techniques to contain them." S. REP. NO. 101-94 at 3. To that end, OPA redresses "gross inadequacies . . . in the CWA's provisions dealing with spiller responsibility for cleanup costs" by extending the CWA's regime of strict, joint, and several liability; limiting the available defenses to liability; increasing the applicable limits to liability; and eliminating the liability limits altogether under certain circumstances. *Id.* at 4–5, 12–14.

OPA holds statutorily-defined "responsible parties" strictly liable for pollution-removal costs and damages associated with oil spills. *See Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 752 (5th Cir. 2011) (stating that OPA "creates a strict-liability scheme for the costs of cleaning up oil

5

spills"). It provides that "each responsible party for a vessel or a facility from which oil is discharged . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a). With respect to vessels, the "responsible party" is "any person owning, operating, or demise chartering the vessel." 33 U.S.C. § 2701(32)(A).

OPA generally limits the liability of a responsible party to a specified dollar amount based on the tonnage of the vessel from which oil was discharged. 33 U.S.C. § 2704(a). However, the limits on liability do not apply if:

> the incident was proximately caused by—(A) gross negligence or willful misconduct of, or (B) the violation of an applicable Federal safety, construction, or operating regulation by, the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party . . . .

33 U.S.C. § 2704(c)(1). Accordingly, under those circumstances, there is no limit to the liability of the responsible party.

In addition to the general limits on liability, OPA provides for a complete defense to liability under four enumerated circumstances. It provides that:

> [a] responsible party is not liable for removal costs or damages . . . if [that] party establishes, by a preponderance of the evidence, that the discharge . . . of oil and the resulting damages or removal costs were caused solely by—(1) an act of God; (2) an act of war; (3) an act or omission of a third party, other than an employee or agent of the responsible party or a third party whose act or omission occurs in connection with any contractual relationship with the responsible party . . . or (4) any combination of paragraphs (1), (2), and (3).

33 U.S.C. § 2703(a). To be entitled to the third-party defense, a responsible party must also establish that it "exercised due care with respect to the oil

concerned" and that it "took precautions against foreseeable acts or omissions" of the third party. 33 U.S.C. § 2703(a)(3)(A)–(B).[3]

ACL contends that it is entitled to the third-party defense under § 2703(a)(3) or, in the alternative, that it is entitled to limit its liability pursuant to § 2704(a). For the reasons stated below, we disagree.

## B

ACL contends that it is entitled to a complete defense to liability under 33 U.S.C. § 2703(a)(3) on the ground that the conduct of DRD, a third party, caused the spill. The government responds that the third-party defense is not available because DRD's conduct occurred in connection with a contractual relationship with ACL. The parties agree that DRD's acts and omissions were the sole cause of the spill and that ACL and DRD had a contractual relationship. They dispute only whether DRD's acts and omissions occurred in connection with that contractual relationship.

The meaning of § 2703(a)(3)'s "in connection with" language is a question of first impression. To determine whether DRD's conduct occurred "in connection with" its contractual relationship with ACL, we begin with the meaning of "connection." *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Because the term is not defined in the statute, we must give it its ordinary meaning. *See id.* ("When a term goes undefined in a statute, we give the term its ordinary meaning."). Webster's Third New International Dictionary defines "connection" as "relationship or association in thought (as of cause and effect, logical sequence, mutual dependence or involvement)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 481 (2002). The Oxford

---

[3] The district court concluded that ACL failed to present sufficient evidence to establish that it satisfied those two requirements. Because we hold that ACL is not entitled to the third-party defense on the ground that DRD's conduct occurred "in connection with" its contractual relationship with ACL, we do not reach the issues of whether ACL exercised due care and took the necessary precautionary measures.

No. 16-31150

English Dictionary defines it as "[t]he condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in, another." 3 OXFORD ENGLISH DICTIONARY 747 (2d ed. 1989).

"Connection" is therefore a capacious term, encompassing things that are logically or causally related or simply "bound up" with one another. It is, however, not so capacious as to be rendered meaningless. Conduct does not automatically occur "in connection with" a contractual relationship by the mere fact that such a relationship exists. *See Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 89 (2d Cir. 1992) (interpreting virtually identical language in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and holding that "[t]he mere existence of a contractual relationship . . . does not foreclose the owner of and from escaping liability"). Rather, the conduct must be causally or logically related to the contractual relationship. Accordingly, the third party's acts or omissions that cause a spill occur "in connection with any contractual relationship" between the responsible party and the third party whenever the acts or omissions relate to the contractual relationship in the sense that the third party's acts and omissions would not have occurred but for that contractual relationship.

This reading of the ordinary meaning of "connection" is consistent with OPA's purpose. *See Buffalo Marine Servs.*, 663 F.3d at 757 ("To determine the meaning of a statute, 'we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" (quoting *Crandon v. United States*, 494 U.S. 152, 156–58 (1990))). The legislative history shows that, in enacting OPA, Congress wanted not only to quickly contain and clean up spills, but also to prevent spills from occurring in the first place by using weighty financial consequences to encourage responsible parties

to take all available precautionary measures. S. REP. NO. 101-94 at 3. To give effect to that purpose, Congress intended to narrowly limit the third-party defense in order to "preclude defendants from avoiding liability by claiming a third party was responsible, when that third party had a contractual relationship with the defendant and was acting, in essence, as an extension of the defendant." *Id.* at 13. Accordingly, the third-party defense should not be available where a spill is caused by third-party acts or omissions that would not have occurred but for the contractual relationship between the third party and the responsible party.

ACL's proposed definition of "in connection with" is contrary to both the statute's text and its purpose. ACL contends that we should adopt the Second Circuit's interpretation of similar language CERCLA.[4] In *Westwood*, the Second Circuit held that the "in connection with" language in CERCLA's third-party defense requires that "the contract between the landowner and the third party must either relate to the hazardous substances *or* allow the landowner to exert some element of control over the third party's activities." 964 F.2d at 91–92 (emphasis added). Even though that test is met here factually in light of the parties' contract to transport oil, we decline to adopt that approach because its additional requirements go beyond what is required by OPA's plain text. Section 2703(a)(3) requires only two things: (1) that a third party's act or omission caused the spill at issue and (2) that that act or omission did not "occur[] in connection with *any* contractual relationship with the responsible party." 33 U.S.C. § 2703(a)(3) (emphasis added). It does not condition the applicability or inapplicability of the exception on the nature of the contract

---

[4] CERCLA's third-party defense provides for a complete defense to liability where the release of a hazardous substance was caused solely by "an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant." 42 U.S.C. § 9607(b)(3).

between the parties. Accordingly, the contract need not explicitly relate to hazardous substances (here, oil) or permit the responsible party to control the third party's activities.

ACL also contends that DRD's acts and omissions cannot be "in connection with" their contractual relationship because those acts and omissions directly violated the terms of their contracts. The charter agreements specifically required DRD to comply with all applicable laws and regulations, but the acts and omissions that caused the spill did not. But "in connection with" does not mean "in compliance with," and the meaning of "connection" is broad enough to encompass acts that are not specifically contemplated, or even acts that are specifically not contemplated, in a contract. A contrary reading would permit responsible parties to circumvent OPA by easily contracting out of liability, a result Congress specifically sought to avoid. *See* S. REP. NO. 101-94 at 13 (stating that the contractual-relationship exception from the third-party defense is intended to "preclude defendants from avoiding liability" through contractual relationships); *see also Buffalo Marine Servs.*, 663 F.3d at 757 & n.36 (citing to *United States v. LeBeouf Bros. Towing Co.*, 621 F.2d 787, 789 (5th Cir. 1980) and rejecting interpretation of "contractual relationship" that would enable defendants to easily avoid liability).

Given the broad meaning of "in connection with," ACL has failed to establish that it is entitled to the third-party defense. The conduct that caused the spill—Captain Carver's leaving the MEL OLIVER under the control of an unlicensed Steersman and Bavaret's working more consecutive hours than permitted under Coast Guard regulations, becoming unconscious while in command of the vessel, and veering into the path of the TINTOMARA while transporting oil at ACL's direction—occurred "in connection with" DRD's contractual relationship with ACL. Pursuant to the charter agreements, DRD

agreed to crew the MEL OLIVER and charter DRD's services to ACL. But for those charter agreements, DRD would not have been operating the MEL OLIVER and transporting ACL's fuel-filled barge, and the spill would not have occurred.

## C

ACL alternatively contends that it is entitled to OPA's general limit on liability. The government responds that DRD's conduct falls within the exception from limited liability for spills proximately caused by "gross negligence," "willful misconduct," or federal regulatory violations committed by "a person acting pursuant to a contractual relationship with the responsible party." *See* 33 U.S.C. § 2704(c)(1). We agree.

The parties dispute whether DRD was acting "pursuant to" its contractual relationship with ACL when it committed the regulatory and criminal violations that caused the spill. Once again, the meaning of § 2704(c)(1)'s "pursuant to" language, which is not defined in the statute, appears to be a matter of first impression. As before, we turn to the ordinary meaning of the words. Black's Law Dictionary defines "pursuant to" as "[i]n compliance with; in accordance with," "[a]s authorized by," or "[i]n carrying out." BLACK'S LAW DICTIONARY 1431 (10th ed. 2014). Webster's Third similarly defines "pursuant to" as "in the course of carrying out; in conformance to or agreement with; [or] according to." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1848 (2002). *See also* OXFORD ENGLISH DICTIONARY 887 (2d ed. 1989) (defining "pursuant to" as "following upon, consequent and conformable to, [or] in accordance with"). Accordingly, and as ACL contends, "pursuant to" has a narrower meaning than "in connection with." While the latter encompasses any conduct that is logically related to the contractual relationships in the sense that it would not have occurred but

for the third party's contractual relationship with the responsible party, the former contemplates compliance or conformity.

However, ACL goes too far when it argues that the specific acts or omissions that cause the spill must be authorized by the contract. Section 2704(c)(1) requires only that the gross negligence, willful misconduct, or federal regulatory violations that cause the spill be committed by the responsible party, its agent or employee, or "a person acting pursuant to a contractual relationship with the responsible party." Accordingly, the "pursuant to" language is satisfied if the person who commits the gross negligence, willful misconduct, or regulatory violation does so in the course of carrying out the terms of the contractual relationship with the responsible party. Reading the statute to require that the negligent or wrongful act itself be "pursuant" to the contract would be nonsensical; it would be a rare contract indeed that specifically contemplated gross negligence, willful misconduct, or the violation of federal safety regulations. Exceptions to statutes are to be construed narrowly, but ACL's proposed construction would read the exception out of the statute altogether.

That the conduct that caused the spill here rose to the level of a criminal violation does not take it out of § 2704(c)(1). ACL contends that because § 2704(c)(1) specifically mentions gross negligence, willful misconduct, and the violation of federal regulations, but says nothing of criminal violations, the exception from limited liability must not apply to the latter. But that draws a false distinction. As evidenced by the facts of this case, there is considerable overlap between gross negligence, willful misconduct, and violations of federal regulations, on the one hand, and criminal violations on the other. There is no principled basis on which to distinguish between the negligent acts that would lift the general limits on liability and the criminal acts that would not. Would the relevant conduct simply have to *be* a criminal violation? That would seem

to largely eviscerate the exception.  Or would the responsible actors have to be actually charged with a criminal violation, or convicted, to take the conduct out of § 2704(c)(1) and reimpose the limits to liability?

Nor would such a distinction give effect to OPA's purpose.  OPA increased the financial consequences of oil spills in order to encourage responsible parties to take precautionary measures to prevent such spills. Section 2704(c)(1), in particular, encourages compliance with the kinds of regulations that are themselves intended to prevent oil spills—like the manning requirements violated by DRD—by providing for unlimited liability where those regulations are flouted.  *See* S. REP. NO. 101-94 at 14 (stating that "where compliance [with federal regulations] perhaps could have prevented or mitigated the effects of an oilspill [sic], no such limits [to liability] will apply"). There is no reason to think that Congress intended to lift the limits on liability for spills caused by conduct that is forbidden by federal regulation but to reimpose those limits for spills caused by conduct considered so dangerous or risky that it is also subject to criminal penalties.  Such a distinction would run counter to OPA's purpose of encouraging compliance with the very rules and regulations intended to prevent oil spills in the first instance.

Finally, ACL's reliance on the doctrine of *respondeat superior* is inapposite.  Under that doctrine, employers are not liable for the intentional torts or criminal acts of their employees if those acts are committed outside the scope of their employment.  But that is of no help to ACL.  First, employer liability under the doctrine of *respondeat superior* is a creature of the common law of agency.  *See* RESTATEMENT (THIRD) OF AGENCY § 2.04 cmt. b (2006) (noting that the doctrine of *respondeat superior* "has long been classified as an element of agency doctrine").  The liability of a responsible party for oil spills caused by the negligence or misconduct of a third party under OPA is a creature of statute.  Second, even if the doctrine of *respondeat superior* were

No. 16-31150

applicable here by analogy, it appears to support our reading of "pursuant to." Employers *are* liable for the intentional torts of their employees if committed by an employee "acting within the scope of their employment." *Id.* § 2.04. Conduct may be within the scope of employment, even if not authorized, if it occurs "while performing work assigned by the employer" and if it is "intended to further any purpose of the employer." *Id.* § 7.07 cmt. b. Accordingly, even if the doctrine of *respondeat superior* were relevant here, our reading of what it means to be "acting pursuant to a contractual relationship" appears to be consistent with the imposition of liability on employers for torts committed by employees in the course of their employment.

Here, there is no dispute that the July 23, 2008 spill was caused by DRD's wrongful conduct and regulatory violations, committed in the course of carrying out its contractual obligation to transport ACL's fuel-filled barge. Accordingly, the spill was caused by the gross negligence, willful misconduct or regulatory violations of "a person acting pursuant to a contractual relationship with" ACL, and ACL is therefore not entitled to limited liability.

**IV**

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.