# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**F I L E D**
March 6, 2012

No. 11-60302

BOARD OF MISSISSIPPI LEVEE COMMISSIONERS,

Plaintiff - Appellant

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LISA P. JACKSON, in her official capacity as Administrator; NANCY STONER, in her official capacity as Acting Assistant Administrator for Water,

Defendants - Appellees

MISSISSIPPI WILDLIFE FEDERATION; NATIONAL WILDLIFE FEDERATION; ENVIRONMENTAL DEFENSE FUND; SIERRA CLUB; GULF RESTORATION NETWORK; AMERICAN RIVERS,

Intervenor Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Mississippi

Before KING, WIENER, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

The Board of Mississippi Levee Commissioners (the "Board") appeals the district court's decision granting summary judgment to the Environmental Protection Agency ("EPA"), Lisa P. Jackson, Nancy Stoner, the Mississippi Wildlife Federation, Sierra Club, Environmental Defense Fund, Gulf Restoration Network, and American Rivers (collectively, "Appellees"), on the Board's claim that the EPA improperly exercised its power to veto a plan to reduce flooding in

No. 11-60302

Mississippi, called the Yazoo Backwater Area Pumps Project (the "Pumps Project" or "Project"). Specifically, the Board claims that the EPA was barred from vetoing the Project under section 404(r) of the Clean Water Act (the "Water Act"), 33 U.S.C. § 1344(r). The Board contends that because all of the requirements of section 404(r) were met, the EPA could not have lawfully vetoed the Project. In response—and for the first time on appeal—the EPA claims that the Board does not have prudential standing to contest the EPA's decision. Additionally, the Board moved to supplement the record on appeal or, in the alternative, for this court to take judicial notice of a Fish and Wildlife Mitigation Report that was not before the district court.

As an initial matter, we DENY the Board's motion to supplement the record on appeal or, in the alternative, for judicial notice. In addition, we conclude that the EPA waived its argument that the Board does not have prudential standing under the Administrative Procedure Act ("APA"). We AFFIRM the district court's decision upholding the EPA's veto, as the record does not contain sufficient evidence to overturn the EPA's findings.[1]

## I. BACKGROUND AND PROCEDURAL HISTORY

To adequately understand this dispute, it is necessary to provide a brief overview of the complex statutory framework, as well as a history of Congress's legislation related to the Pumps Project.

A.     Overview of the Water Act and the National Environmental Policy Act (the "Environmental Act")

    *1.     Water Act*

Congress enacted the Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this purpose, Congress made "the discharge of any pollutant by any

---

[1] Both sides also present non-legal arguments as to why their position is correct. The Appellees argue that the Project will be devastating to the environment, and the Board argues that without the Project, flooding will continue to devastate the area. Congress, not this court, is the best place to resolve these policy disputes.

person . . . unlawful," 33 U.S.C. § 1311(a), unless the discharge complies with section 404 of the Water Act. Under section 404, the Corps must generally issue a permit before any such discharge occurs, *see* 33 U.S.C. § 1344(a); however, when the Corps is the sponsor of the project, it need not issue itself a permit, but it must comply with section 404(b)(1). *See* 33 U.S.C. § 1344(b)(1); 33 C.F.R. § 336.1. Section 404(b)(1) of the Water Act requires the Secretary of the Corps to apply guidelines developed jointly by the EPA and the Corps. 33 U.S.C. § 1344(b)(1).

Section 404(r) was added in 1977, and it provides that the discharge of dredged or fill material is not subject to certain provisions of the Water Act—including the requirements imposed by section 404—if:

> information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section [404] is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

33 U.S.C. § 1344(r). The purpose of this subsection was to prevent an executive agency from nullifying a project that was specifically authorized by Congress, "in recognition of the constitutional principle of separation of powers." *Monongahela Power Co. v. Marsh*, 809 F.2d 41, 51 n.92 (D.C. Cir. 1987).

### 2.    *Environmental Act*

As noted above, to satisfy section 404(r), the environmental impact statement ("EIS") that is transmitted to Congress must comply with the Environmental Act. 33 U.S.C. § 1344(r). The Environmental Act requires that when an agency proposes a "major Federal action[] significantly affecting the quality of the human environment," the agency must prepare an EIS that

documents the environmental impact of the proposed action and provides other alternatives as a comparison. 42 U.S.C. § 4332(2)(C). The EIS must include an analysis of: (1) "the environmental impact of the proposed action"; (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) alternatives to the proposed action; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.* § 4332(2)(C)(i)-(v).

The Council on Environmental Quality, which has been given authority to promulgate regulations applicable to the federal agencies, has set out the process for preparing an EIS. The regulations provide that an EIS is prepared in two stages: draft and final. *See* 40 C.F.R. § 1502.9. Both the draft and final versions of the EIS must be circulated to other federal agencies which have jurisdiction or special expertise in the area; federal, state, or local agencies "authorized to develop and enforce environmental standards"; any individual who requests a copy of the EIS; and, in the case of a final EIS, anyone who submitted comments on the draft. *Id.* § 1502.19(a), (c), (d). The agency must also respond to all substantive comments, *id.* § 1503.4(a), and prepare a Record of Decision at the time of its decision, *id.* § 1505.2.

B.    Legislation Related to the Pumps Project

Congress has enacted several statutes designed to help control flooding from the Mississippi River. Congress passed the Flood Control Act of 1928, which authorized a system of levees to help control flooding from the Mississippi River. *See* FLOOD CONTROL ACT OF 1928, 45 Stat. 534, 33 U.S.C. § 701 *et seq.* In 1941, the Mississippi River Commission presented a report recommending that the Yazoo Backwater Area be protected from flooding by extending a levee along

the west bank of the Yazoo River. FLOOD CONTROL ON THE LOWER MISSISSIPPI RIVER, H. R. Doc. No. 77-359, at 38 (1941). However, the report concluded that because extending the levees would cause drainage problems along the Sunflower River, additional steps would have to be taken to protect this area. *Id.* It proposed three plans, *see id.* at 39-41, but Congress authorized "Plan C" set out by the Mississippi River Commission. FLOOD CONTROL ACT OF 1941, Pub. L. No. 77-288, 55 Stat. 638. Plan C "assume[d] that pumps of about 14,000 cubic feet per second capacity would be provided to prevent the sump level from exceeding 90 feet, mean Gulf level . . . ."[2] FLOOD CONTROL ON THE LOWER MISSISSIPPI RIVER, *supra*, at 38.

C.    Timeline of Agency Efforts Related to the Pumps Project

Activity did not begin on the Project until the late 1950's due to World War II and the Korean War. The Corps reevaluated Plan C in 1959 and concluded that a pumping plant was no longer needed. In 1978, the Corps again reevaluated the Project and proposed modifying Plan C to drain acreage below 80 feet (instead of 90 feet, as Congress authorized in 1941). Four years later, it issued a Reevaluation Report, in which it recommended that the sump level not exceed 80 feet and proposed installation of a "17,500-cubic-feet-per-second pumping station . . . ." U.S. Army Corps of Engineers, Yazoo Area Pump Project, Reevaluation Report – Environmental Impact Statement (July 1982). The Reevaluation Report purported to contain a "final" EIS.[3] Together with the 1982 Reevaluation Report, the Corps also published a Post-Authorization Change Report, which was written to determine if the Corps needed Congress's

---

[2] The sump level is the level above which water would not be allowed to rise in the event of a flood. In this case, the pump would be activated when the water rose above 90 feet, mean Gulf level.

[3] Although the EIS is described as "final," the parties heavily dispute whether this EIS was actually "final" pursuant to the Environmental Act.

No. 11-60302

authorization in order to implement the changes made in the 1982 Reevaluation Report/EIS.     The Post-Authorization Change Report stated that "[t]he recommended plan will provide flood protection to those additional lands which have been converted to agricultural production since initial authorization." U.S. Army Corps of Engineers, Yazoo Area Pump Project Post Authorization Change Notification Report (July 1982, revised November 1982).  Major General John Wall of the Corps delegated authority to the Mississippi River Commission to file the EIS in this case on February 2, 1983.

The Corps also prepared a Fish and Wildlife Mitigation Report concerning the Project to comply with the Fish and Wildlife Coordination Act of 1958.  This report, along with a "Final Environmental Impact Statement with addendum" and the "Project Reevaluation Report" were circulated with a request for comments on March 28, 1983.

Also on March 28, 1983, a member of the Corps sent two identical letters to Representative James J. Howard, Chairman of the Committee on Public Works and Transportation, and Senator Robert T. Stafford, Chairman of the Committee on Environment and Public Works, which read as follows:

> A copy of the proposed report of the Chief of Engineers on Yazoo Backwater Project, Mississippi – Fish and Wildlife Mitigation Report, and other pertinent reports and a Final Environmental Impact Statement, with addendum, are enclosed for your information. . . .  Upon receipt of comments on the proposed report and environmental statement from the States of Mississippi and Louisiana and appropriate federal agencies, the Chief of Engineers will forward his final report to the Secretary of the Army.

Letter from James W. Ray, Colonel, Corps of Engineers, to Hon. James J. Howard, Chairman, Committee on Public Works and Transportation, U.S. House of Representatives (Mar. 28, 1983) [hereinafter "Howard Letter"]; Letter from James W. Ray, Colonel, Army Corps of Engineers, to Hon. Robert T. Stafford, Chairman, Committee on Environment and Public Works, U.S. Senate (Mar. 28,

No. 11-60302

1983) [hereinafter "Stafford Letter]. Both parties agree that the attachments to the letters are not in the administrative record.

On July 7, 1983—several months after the letters to the congressmen were sent—the Mississippi River Commission signed a Record of Decision approving the 1982 Reevaluation Report, which included the EIS. A member of the Corps sent the Record of Decision to various state and federal agencies and officials.

Additionally, as the letters promise, the Chief of Engineers transmitted his final report on the Mitigation Plan to the Secretary of the Army "for transmission to Congress" on July 12, 1984. Because of the nature of the mitigation plan, which included a recommendation that the government purchase 6,500 acres of land to "mitigate" the impact of the Project, it was apparently determined that congressional approval would be necessary. Congress authorized the Mitigation Plan in the Water Resources Development Act of 1986, Pub. L. No. 99-662, 100 Stat. 4082. However, there is no evidence that a similar transmission occurred with respect to the "final" EIS.

After the Record of Decision was signed by the Mississippi River Commission, construction on the Project began in 1986. Construction was soon halted by passage of the Water Resources Development Act of 1986, § 103(e)(1), Pub. L. No. 99-662, 100 Stat. 4082, which required the local project sponsors to share in the costs of construction. Construction effectively ceased until the cost sharing provision was reversed in 1996, restoring the project to being fully funded by the federal government.

Between 1998 and 2000, the EPA focused on attempting to reduce the environmental impact of the Project. In 2000, because a significant time had elapsed since the previous environmental study, the Corps determined that it must update its analysis of the environmental impact of the Project pursuant to the Environmental Act. The Corps developed a Draft Reformulation Report and

7

No. 11-60302

a supplemental EIS in 2000, which proposed revising the Project (again) to revert to a 14,000 cubic-feet-per-second pumping station that would drain acreage below 87 feet. Between 2002 and 2005, the EPA worked with the Corps to try to reduce the impact of the Project on the environment. The EPA remained opposed to the Project when the Reformulation Report and the supplemental EIS were released as final in November 2007.

On February 1, 2008, the EPA's Region IV Administrator informed the Corps and the Board of its intent to review the Project pursuant to section 404(c) of the Water Act. After meeting with the Corps, the Board, and the Fish and Wildlife Service on February 29, 2008, the EPA published a proposed determination in the Federal Register. *See* Proposed Determination To Prohibit, Restrict, or Deny the Specification, or the Use for Specification, of an Area as a Disposal Site; Yazoo River Basin, Issaquena County, 73 Fed. Reg. 14806 (Mar. 19, 2008). A public comment period was held from March 19 to May 5, 2008, and the EPA held a hearing on April 17, 2008. During this time, Senator Thad Cochran of Mississippi and Mississippi Governor Haley Barbour urged the EPA to stop the 404(c) process.

After the public comment period, the EPA's Regional Administrator signed the Recommended Determination, which initiated a period of review and final action by the EPA. Both the Board and the Corps commented on the EPA's Recommended Determination, as did Representative James Oberstar (who was concerned about the environmental impact of the Project), and Senators Thad Cochran and Roger Wicker (who argued that the EPA had no authority to veto the Project pursuant to section 404(r) and provided an analysis of section 404(r) done by the Congressional Research Service). The Fish and Wildlife Service supported the EPA's Recommended Determination. Based on the comments received and its own conclusions regarding the adverse environmental impacts

8

of the Project, the EPA formally vetoed the Project in August 2008. *See* Final Determination of the U.S. Environmental Protection Agency's Assistant Administrator for Water Pursuant to Section 404(c) of the Clean Water Act Concerning the Proposed Yazoo Backwater Area Pumps Project, Issaquena County, Mississippi (Aug. 31, 2008), *available at* http://water.epa.gov/ lawsregs/guidance/cwa/dredgdis/upload/2008_09_02_wetlands_Yazoo_Final_D etermination_Signed_8-31-08.pdf [hereinafter "Final Determination"].

In the Final Determination, the EPA set out its reasoning as to why it viewed section 404(r) as inapplicable. Specifically, it found that the "EPA has no evidence that an EIS for the proposed project was ever submitted to Congress, let alone before the actual discharge of dredged or fill material in connection with the construction of the project occurred, and prior to either authorization of the project or an appropriation of funds for construction." *Id.* at 16. Additionally, the EPA noted that

> even if the Final EIS had been submitted to Congress, the information and analysis it contained were not adequate to satisfy section 404(r). The purpose of providing the EIS to Congress is to ensure that Congress has the full information on the environmental impacts of the project before making a decision whether or not to authorize the project or to appropriate funds for its construction. EPA's comments on both the 1982 Draft EIS as well as the Final EIS note the deficiencies in [Environmental Act] documentation. . . .

*Id.* at 18-19. Thus, for this and other reasons, the EPA formally decided that section 404(r) did not apply to the Project, and therefore concluded that it had veto authority under section 404(c).

The Board filed suit against the EPA on August 11, 2009, alleging that the EPA did not have authority to veto the Project pursuant to section 404(r). Both parties filed motions for summary judgment below. Both parties rely on the

documents in the administrative record.  Based on these documents, the district court granted summary judgment to the EPA, concluding that the EPA's veto was not unlawful because the record did not contain evidence that the EIS for the Pumps Project was submitted to Congress.  The district court entered a final judgment for the EPA on March 28, 2011, and the Board timely appealed.

## II.  STANDARD OF REVIEW AND JURISDICTION

We review a grant of summary judgment de novo, applying the same standard as the district court.  *Gen. Universal Sys. v. HAL Inc.*, 500 F.3d 444, 448 (5th Cir. 2007).  Under the APA, a federal court may only overturn an agency's ruling "if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole."  *Buffalo Marine Servs. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011) (internal quotation marks and citation omitted).  We must start from "'a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous.'"  *Id.* (quoting *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010)).  The agency's factual findings are reviewed only to determine if they are supported by substantial evidence, and the agency's legal determinations are reviewed de novo.  *Id.* (citing *Alwan v. Ashcroft*, 388 F.3d 507, 510-11 (5th Cir. 2004)).  With respect to questions of statutory interpretation, we owe "substantial deference to an agency's construction of a statute that it administers."  *Id.* at 753-54 (internal quotation marks and citation omitted).  We must be "'highly deferential to the administrative agency whose final decision is being reviewed.'"  *Id.* at 754 (quoting *Tex. Clinical Labs, Inc.*, 612 F.3d at 775).

No. 11-60302

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 702 and 704 (jurisdiction under the APA). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

### III.  DISCUSSION[4]

A.     Whether the Board has prudential standing to claim that the EPA improperly vetoed the Pumps Project because the Project was exempt under section 404(r) of the Water Act.

In its appellate brief, the EPA raises—for the first time on appeal—the question of whether the Board has prudential standing to challenge the EPA's decision to veto the Project.  It argues that the Board seeks to assert the legal rights of the Corps, and the Board has no legal right to have the Project completed.  The Board argues that the EPA waived its prudential standing argument, as it failed to raise it before the district court.

Unlike constitutional standing, prudential standing arguments may be waived.  *See, e.g.*, *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999) (finding a prudential standing argument waived).  Although the EPA correctly points out that we have previously considered the issue *sua sponte*, *see Nat'l Solid*

---

[4] The Board seeks to supplement the appellate record or have us take judicial notice of the Fish and Wildlife Mitigation Report.  We have generally declined to supplement the appellate record with materials not presented to the district court, though we have the discretion to do so.  *Gibson v. Blackburn*, 744 F.2d 403, 405 n.3 (5th Cir. 1984).  Here, we conclude that consideration of the Mitigation Report is unnecessary to resolve the issues on appeal, and allowing supplementation would only serve to further undermine the general rule that a party may not add documents to the record that were not presented to the district court. *Id.* at 405 n.3. Similarly, we decline to take judicial notice of this report, as we have previously determined that a party may not avoid the rule against supplementing the record with a document not before the district court by requesting that the appellate court take judicial notice of the document. *See United States v. Okoronkwo*, 46 F.3d 426, 435 (5th Cir. 1995) (noting that requests for the Court to take judicial notice of evidence not presented to the district court "constitute[] an impermissible attempt to supplement the record on appeal"); *Kemlon Prods. & Dev. Co. v. United States*, 646 F.2d 223, 224 (5th Cir. 1981) (refusing to take judicial notice after rejecting an attempt to supplement the record on appeal).

No. 11-60302

*Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 498 (5th Cir. 2004), we decline to do so here.  Because the EPA failed to make this argument to the district court, we hold that the EPA waived its prudential standing challenge.

B.     Whether the statutory requirements of section 404(r) were met, such that section 404(r) bars exercise of the EPA's authority to veto the Project.

The following requirements must be met under section 404(r): (1) the project at issue must be specifically authorized by Congress; (2) an EIS that satisfies the Environmental Act and section 404(b)(1) must be submitted to Congress; and (3) the EIS must be "submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction."  33 U.S.C. § 1344(r).  At the administrative level, the EPA made a factual finding that it possessed "no evidence that an EIS for the proposed project was ever submitted to Congress . . . ."  Final Determination, *supra*, at 16.  We review the EPA's finding only to ensure that it is "supported by substantial evidence."  *Buffalo Marine Servs.*, 663 F.3d at 753.

The Board argues that all three conditions were met and, thus, the EPA unlawfully vetoed the Project.  We conclude that the Board failed to show that an EIS that satisfied the Environmental Act and section 404(b)(1) of the Water Act was submitted to Congress.  Therefore, we find it unnecessary to address the Board's remaining arguments related to section 404(r).

To overcome the presumption that the EPA's factual finding should be upheld, the Board argues that the 1983 letters to Representative James J. Howard and Senator Robert T. Stafford are evidence that the EIS for the Project was "submitted to Congress."  However, the EIS that was allegedly submitted to Representative James J. Howard and Senator Robert T. Stafford as an attachment to the letters does not exist in the administrative record.  The letters

12

No. 11-60302

do not specify that the "final EIS" relates to the Project, and although it would be reasonable to infer that the EIS to which the letters referred related to the Project, it is also plausible that it did not. These two ambiguous letters, without further evidence that the EIS prepared *for the Project* was transmitted to Congress, are insufficient to show that the EPA's decision that section 404(r) does not apply is erroneous. *See Buffalo Marine Servs.*, 663 F.3d at 753.

Additionally, even if we were to find that the letters showed that the EIS for the Project was included as an attachment, there is no evidence in the record to show that the EIS complied with guidelines developed pursuant to section 404(b)(1) of the Water Act or with the Environmental Act. The district court concluded, and we agree, that it is unlikely that the "final EIS" mentioned in the letters—even if it was the EIS related to the Project—was actually "final" under the regulations. Certainly it is not so likely that we must overturn the EPA's contrary finding.

The regulations provide that an agency that prepares an EIS must file the EIS and comments and responses with the EPA. 40 C.F.R. § 1506.9. It must also circulate the draft and final EIS to federal agencies that have jurisdiction with respect to any environmental impact involved; other federal, state or local agencies "authorized to develop and enforce environmental standards"; "[a]ny person, organization, or agency requesting the entire environmental impact statement"; and "any person, organization, or agency which submitted substantive comments on the draft," that may submit comments. *Id.* § 1502.19. The agency must then address comments received on the draft EIS in the final EIS. *Id.* § 1503.4. The regulations also require that the agency prepare a Record of Decision stating the agency's decision and discussing the agency's consideration of alternatives. *Id.* § 1505.2. The Record of Decision may not be

13

issued until at least 30 days after publication of a notice that the final EIS is available. *Id.* § 1506.10(b)(2).

The Board vehemently disagrees that an EIS is not "finalized" until after comments on the final EIS are received and until the Record of Decision is signed. It argues that the Record of Decision "determines what the decisionmaker will do based on the finalized EIS." However, it cites to a letter sent in July 1983—several months *after* the letters on which the Board relies—from the Mississippi River Commission to the EPA stating that the Record of Decision was forwarded "[t]o complete procedural compliance with the National Environmental Policy Act following final review of the Final Environmental Impact Statement for the Yazoo Area Pump Project." Letter from Joseph Yore, Secretary, Mississippi River Commission, to Paul Cahill, Director, Office of Federal Activities of the EPA (July 18, 1983). Contrary to the Board's argument, this letter supports the district court's conclusion and the EPA's argument that a Record of Decision is required to finalize an EIS under the Environmental Act.

Additionally, the 1983 version of the regulation related to the Record of Decision provided that the "Record of Decision will be completed to document the Corps [sic] final decision or recommendation to Congress on a proposed action requiring an EIS." 33 C.F.R. § 230.12 (1983)[5]; *see also* 40 C.F.R. 1505.2 (noting that "[a]t the time of its decision (§ 1506.10) *or, if appropriate, its recommendation to Congress*, each agency shall prepare a concise public record of decision" (emphasis added)). This regulation indicates that the agencies believed that a Record of Decision was necessary when providing a "recommendation to Congress on a proposed action requiring an EIS." 33 C.F.R. § 230.12.

---

[5] Other than this citation to the 1983 version of the Code of Federal Regulations, all other citations to the regulations are to the current version.

Although the letters were dated March 28, 1983, the EPA did not submit comments on the final EIS until May 1983, and it did not issue a Record of Decision until July 1983. These facts support a finding that although the EIS existed in March 1983 and was called a "final EIS," that EIS did not comply with the regulations issued pursuant to the Environmental Act, as required by section 404(r), until the Record of Decision was signed in July 1983. The Board admits that "the Corps' then-current [Environmental Act] Procedures provided that the Corps headquarters or the district engineer must respond to comments on final EISs [sic] (such as EPA's May, 1983 comments . . .)[.]" Indeed, the letters relied upon by the Board expressly state that the environmental review process was still underway, noting that "[u]pon receipt of comments on the proposed report and environmental statement from the States of Mississippi and Louisiana and appropriate federal agencies, the Chief of Engineers will forward his final report to the Secretary of the Army." Howard Letter, *supra*; Stafford Letter, *supra*.

Based on the regulations and the EPA's interpretation of them, which is entitled to deference, *see Talk America, Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011), we conclude that even if an EIS related to the Project was sent to Congress in March 1983, the EPA's conclusion that it was not "final" should not be set aside as no Record of Decision had been signed until after the letters were sent. Further, as discussed above, the letters themselves indicate that the EIS was not final at the time it was allegedly transmitted.

Additionally, the Corps—the agency that was responsible for sending the letters in March 1983—indicated that it did not intend to seek an exemption pursuant to section 404(r) for the Project. *See* Letter from John Paul Woodley, Jr., Assistant Secretary of the Army, to Hon. Thad Cochran, U.S. Senate (Feb. 10, 2009). This conclusion is supported by the fact that the Corps sought and obtained a water quality certification from the State of Mississippi. Had the

No. 11-60302

Corps intended to seek an exemption under section 404(r), it would have also been exempt from the requirement of obtaining a state water quality certificate pursuant to section 401 of the Water Act. *See* 33 U.S.C. § 1344(r). The record contains a document from the Corps' Vicksburg District detailing its Standard Operating Procedures. *See* U.S. Army Corps of Engineers, Water Resource Policies and Authorities: Application of Federal Regulations Implementing Section 404 to Civil Works Projects (Sept. 18, 1979). This document sets out three options for the Corps to meet its obligations under section 404: (1) seek an exemption pursuant to section 404(r) as part of the authorization process; (2) obtain a state water quality certification pursuant to section 401; or (3) seek an exemption under section 404(r) after authorization by submitting an EIS to Congress. The record demonstrates that the Corps pursued the second option, as it sought a state water quality certification under section 401. Additionally, after the Corps revised the Project in 2007, it again sought a state water quality certification. The Corps' interpretation of section 404 shows that it would *either* have to seek an exemption under 404(r) *or* comply with section 401. The fact that it instead sought a state water quality certification indicates that the Corps did not believe that section 404(r) applied. Additionally, this document demonstrates that the Corps was aware of the process for seeking a section 404(r) exemption and that, had it intended to do so, it would have followed the Standard Operating Procedures.

Because the administrative record fails to show that an EIS that satisfied the Environmental Act and section 404(b)(1) was submitted to Congress, we find it unnecessary to address the remaining requirements of section 404(r). For the foregoing reasons, we affirm the district court's decision to grant summary judgment to the EPA.

AFFIRMED; MOTIONS DENIED.