KAVANAUGH, Circuit Judge,
dissenting:
Federal law establishes a renewable fuel mandate that requires gasoline producers to introduce significant amounts of renewable fuel (such as ethanol) into the Nation’s gasoline supply. To maintain statutory clean air standards, however, EPA is required to approve new fuels and fuel additives such as ethanol, and EPA may do so only when the new fuel would not cause any car models made after 1974 to violate federal emissions standards. EPA had previously approved use of E10, gasoline with up to 10% ethanol, for use in cars. But the requirement set by the statutory renewable fuel mandate could not be reached solely with E10. Ethanol manufacturers then petitioned EPA to exercise its statutory waiver authority to allow use of E15, gasoline with up to 15% ethanol. In order to issue the waiver under the statute, EPA had to find that E15 would not cause any car models made after 1974 to fail to meet emissions standards. EPA found that E15 could cause emissions failures in some cars made after 1974 (namely, in cars made between 1975 and 2000). Nonetheless, EPA still granted the waiver. For the first time ever, EPA granted what it termed a “partial waiver,” meaning that the waiver allowed E15 use only in cars made after 2000.
In this suit, members of the food industry and the petroleum industry contend that EPA’s E15 waiver is illegal. The food group is suing because, as a result of EPA’s E15 waiver, ethanol production will increase and demand for corn (a necessary raw material for ethanol) will rise significantly. In turn, corn prices will rise. Therefore, food producers, which compete directly with ethanol producers in the up *181 stream market for purchasing corn, will have to pay more for corn. The petroleum group is suing because, as a result of EPA’s E15 waiver and the statutory renewable fuel mandate, those in the petroleum industry now must refine, sell, transport, and store E15, incurring significant costs to do so.
Despite the fact that two enormous American industries will be palpably and negatively affected by EPA’s allegedly illegal E15 waiver, the majority opinion tosses the case for lack of standing. Judge Tatel and I agree that the food group has Article III standing. But the majority opinion finds that the food group is not an aggrieved party (that is, does not have prudential standing) for purposes of the Administrative Procedure Act. And the majority opinion concludes that the petroleum group’s injury is not caused by EPA’s E15 waiver decision and that the petroleum group thus does not have Article III standing.
This suit may proceed if either the food group or the petroleum group has standing. In my view, both have standing.
The food group has Article III standing because the E15 waiver, particularly in conjunction with the statutory renewable fuel mandate, will increase the prices the food group must pay for corn. And the food group’s prudential standing under the APA is not contested by EPA. That matters because prudential standing (unlike Article III standing) is not jurisdictional, meaning that prudential standing has been forfeited by EPA and is thus not properly before the Court. In any event, the food group easily clears the low bar for prudential standing under the APA.
The petroleum group has Article III standing because the E15 waiver, in eon-junction with the statutory renewable fuel mandate, will require some petroleum companies to refine, sell, transport, or store E15, imposing significant costs. And even if prudential standing were not forfeited, the petroleum group is a party regulated under the statutory waiver provision; therefore, the petroleum group’s prudential standing under the APA is undisputed.[1]
On the merits, I conclude that the E15 waiver violates the statute. The waiver might be good policy; if so, Congress has the power to enact a new law permitting E15. But under the statute as currently written, EPA lacks authority for the waiver. I would therefore grant the petition for review and vacate EPA’s E15 waiver decision. I respectfully dissent.
I
The Constitution limits the jurisdiction of federal courts to “Cases” and “Controversies.” U.S. Const. art. III, § 2, cl. 1. One aspect of the case or controversy requirement is standing. To sue in federal court, a plaintiff must demonstrate Article III standing, which consists of three requirements: (1) injury in fact — an invasion of a legally protected interest that is concrete and particularized, and actual or imminent; (2) causation — a fairly traceable connection between the injury and the challenged conduct; and (3) redressability — a likelihood that the injury will be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In the regulatory context, standing has not been limited to those directly regulated by an agency. Rather, under settled standing case law, those who suffer injury as a result of an agency’s *182 allegedly illegal regulation of someone else can still have standing, although the analysis in such cases is tricky (and frankly rather unpredictable).[2] Article III standing is jurisdictional, meaning courts must consider the issue even if the defendant or respondent does not assert that the plaintiff or petitioner lacks Article III standing.
In addition, the Administrative Procedure Act’s general cause of action for challenging agency action extends only to parties “aggrieved” by the agency action. See 5 U.S.C. § 702. The cause of action’s limitation to “aggrieved” parties is referred to (somewhat loosely and imprecisely) as prudential standing. As explained more fully below, prudential standing is not jurisdictional, meaning that it can be forfeited and need not be considered by the court if the defendant or respondent does not assert it.
A
First, I will explain why the food group has standing. For its part, EPA has not contested the food group’s Article III and prudential standing. A majority of the Court — Judge Tatel and I — conclude that the food group has Article III standing. A different majority — Chief Judge Sentelle and Judge Tatel — conclude, however, that the food group lacks prudential standing to challenge EPA’s E15 waiver.
The food group includes producers of processed food made with corn and those who raise livestock fed with corn. It is hard to overestimate the significance of corn to the American food industry. And petitioners’ submissions to EPA and this Court reveal the following about the effects of EPA’s E15 waiver on the food industry: In E10, up to 10% of gasoline is made up of ethanol. In E15, up to 15% of gasoline is made up of ethanol. That’s a 50% increase in the amount of ethanol used. In hard numbers, with only E10 on the market, 14 billion gallons of ethanol could be produced each year for the Nation’s gasoline supply. With E15 on the market, 21 billion gallons of ethanol can be produced each year. That’s an additional 7 billion gallons of ethanol annually produced for use in the U.S. gasoline supply. As a result of the E15 waiver, there is likely — -indeed, nearly certain in the current market — to be a significant increase in demand for corn to -produce ethanol. The extra demand means that corn producers can charge a higher price. Therefore, the E15 waiver will likely cause higher corn prices, and members of the food group that depend on corn will be injured. See generally, e.g., Advanced Economic Solutions, Implications for US Corn Availability Under a Higher Blending Rate for Ethanol (June 2009), J.A. 604.
This is Economics 101 and requires no elaborate chain of reasoning. It is no surprise that EPA — which is typically quite aggressive in asserting standing objections in lawsuits against it — has not contested the food group’s standing in this case. The food group has standing under Article III.
Even apart from that analysis, the food group has Article III standing based on our competitor standing cases. When an agency illegally regulates an entity’s competitor in a way that harms the entity — for example, by loosening regulation of the competitor — we have said that the entity has Article III standing to challenge the allegedly illegal regulation. See, e.g., Sherley v. Sebelius, 610 F.3d 69, 72 (D.C.Cir.2010) (“The doctrine of competi *183 tor standing addresses the first requirement [of Article III standing] by recognizing that economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them.”) (internal quotation marks and brackets omitted); Honeywell International Inc. v. EPA 374 F.3d 1363, 1369 (D.C.Cir.2004) (“it is well established that parties suffer cognizable injury under Article III when an agency lifts regulatory restrictions on their competitors or otherwise allows increased competition”) (internal quotation marks and brackets omitted); Louisiana Energy & Power Authority v. FERC, 141 F.3d 364, 367 (D.C.Cir.1998) (“We repeatedly have held that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.”). Here, EPA’s E15 waiver loosens a prohibition on gasoline and ethanol producers and thereby harms entities such as the food group that directly compete with gasoline and ethanol producers in the upstream market for purchase of corn. See Sherley, 610 F.3d at 72-74 (similarly finding doctors have competitor standing after agency loosened restrictions and thereby allowed increased competition in upstream market for grants that fund research). Our competitor standing precedents thus independently support Article III standing for the food group.
A majority of the Court — Judge Tatel and I — agree that the food group has Article III standing. But Chief Judge Sentelle and Judge Tatel conclude that the food group lacks prudential standing.
Contrary to their majority opinion, I would conclude that prudential’ standing likewise poses no barrier for the food group. To begin with, EPA did not raise prudential standing as a defense to this lawsuit. That’s critically important because prudential standing is not jurisdictional and thus can be forfeited when the defendant or respondent fails to assert it. Because EPA did not challenge the food group’s prudential standing, any prudential standing objection is forfeited.
The majority opinion concludes that prudential standing is jurisdictional. See Maj. Op. at 179-80 (rejecting food group’s claims solely on prudential standing grounds); Maj. Op. at 172, 180 (dismissing all claims, including those of food group, for lack of jurisdiction).
In my view, Supreme Court precedent makes clear, however, that prudential standing is not jurisdictional. Prudential standing concerns who may sue; it is an aspect of the cause of action that stems from the Administrative Procedure Act’s limiting its cause of action to “aggrieved” parties. See Bond v. United States, — U.S. -, 131 S.Ct. 2355, 2362-63, 180 L.Ed.2d 269 (2011); Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 97 & n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).[3] Prudential standing is not jurisdictional because prudential standing has not been ranked by Congress as jurisdictional and is not a limitation on a court’s authority to hear a case, as opposed to a limitation on who may sue to challenge a particular agency action. See Reed Elsevier, Inc. v. Muchnick, — U.S. -, 130 S.Ct. 1237, 1243-44, 176 L.Ed.2d 18 (2010).
In recent years, the terminology of jurisdiction has been put under a microscope at the Supreme Court. And the Court has not liked what it has observed — namely, sloppy and profligate use of the term “jurisdiction” by lower courts and, at times in the past, the Supreme Court itself. These *184 recent Supreme Court cases have significantly tightened and focused the analysis governing when a statutory requirement is jurisdictional. In Reed Elsevier, for example, the Court emphasized that a statutory requirement is jurisdictional when it speaks to the power of a court to hear a case rather than to the rights of or restrictions on the parties. Id. at 1243; see also Gonzalez v. Thaler, — U.S. -, 132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012) (“Recognizing our less than meticulous use of the term in the past, we have pressed a stricter distinction between truly jurisdictional rules, which govern a court’s adjudicatory authority, and nonjurisdictional claim-processing rules, which do not.”) (internal quotation marks omitted); Henderson ex rel. Henderson v. Shinseki, — U.S. -, 131 S.Ct. 1197, 1202-03, 179 L.Ed.2d 159 (2011) (“We have urged that a rule should not be referred to as jurisdictional unless it governs a court’s adjudicatory capacity, that is, its subject-matter or personal jurisdiction. Other rules, even if important and mandatory, we have said, should not be given the jurisdictional brand.”) (citations omitted); Bowles v. Russell, 551 U.S. 205, 213, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007) (“the notion of subject-matter jurisdiction obviously extends to classes of cases falling within a court’s adjudicatory authority”) (internal quotation marks and ellipsis omitted); Arbaugh v. Y & H Corp., 546 U.S. 500, 510, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (“Jurisdiction, this Court has observed, is a word of many, too many, meanings.”) (internal quotation marks omitted); Kontrick v. Ryan, 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (“Clarity would be facilitated if courts, and litigants used the label ‘jurisdictional’ not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court’s adjudicatory authority.”).
The APA cause of action — which speaks in terms of giving “aggrieved” parties a cause of action — does not address the power of the court to hear the case. Therefore, it is quite obviously not jurisdictional under the recent Supreme Court precedents.
Indeed, although the Supreme Court has not yet directly addressed whether prudential standing is jurisdictional, the Court has suggested that it is not. In Tenet v. Doe, the Court noted that prudential standing is a “threshold question” that “may be resolved before addressing jurisdiction.” 544 U.S. 1, 7 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005) (emphasis added). While that snippet alone may be too thin a reed on which to base a definitive conclusion, it certainly is consistent with the thrust of the recent Supreme Court precedents on jurisdiction and points us further in the direction of saying that prudential standing is not jurisdictional.
Several courts of appeals have addressed the prudential standing issue in recent years — that is, since the Supreme Court’s intensified focus on proper use of the term jurisdiction. And those courts likewise have determined that prudential standing is not jurisdictional. See, e.g., Board of Mississippi Levee Commissioners v. EPA, 674 F.3d 409, 417 (5th Cir.2012) (“Unlike constitutional standing, prudential standing arguments may be waived.”); Independent Living Center of Southern California, Inc. v. Shewry, 543 F.3d 1050, 1065 n. 17 (9th Cir.2008) (“Unlike the Article III standing inquiry, whether ILC maintains prudential standing is not a jurisdictional limitation on our review. By failing to articulate any argument challenging ILC’s prudential standing, the Director has waived that argument.”) (citation and internal quotation marks omitted); Rawoof v. Texor Petroleum Co., 521 F.3d 750, 756 (7th Cir.2008) *185 (“Prudential-standing doctrine is not jurisdictional in the sense that Article III standing is.”) (internal quotation marks omitted); Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir.2007) (“Prudential standing is not jurisdictional in the same sense as Article III standing.... We could therefore decline to address this argument, as it was not raised in the court below.”); Gilda Industries, Inc. v. United States, 446 F.3d 1271, 1280 (Fed.Cir.2006) (“In the end, we do not need to reach or decide the question whether Gilda satisfies the standing requirements of the Administrative Procedure Act, because the government did not contend in its brief that Gilda’s complaint should be barred by the zone of interests test. The government has thus waived that argument.”); see also, e.g., American Iron & Steel Institute v. OSHA, 182 F.3d 1261, 1274 n. 10 (11th Cir.1999) (“We can pretermit the more difficult question regarding whether the Doctors’ members’ interests fall within the zone of interests protected by the OSH Act because prudential standing is flexible and not jurisdictional in nature.”) (citations omitted).[4]
In short, respondent EPA has not raised prudential standing. EPA has thus forfeited the argument. Contrary to the weight of authority and the direction marked by the Supreme Court, the majority opinion here concludes that prudential standing is jurisdictional. See Maj. Op. at 172, 179-80. The majority opinion thus creates a deep and important circuit split on this important issue. In my respectful view, the Supreme Court’s recent decisions on jurisdiction show that the majority opinion is incorrect on this point.[5]
*186 Even if prudential standing were jurisdictional and we therefore had to consider the issue notwithstanding EPA’s failure to raise it, I would conclude that the food group has prudential standing for either of two independent reasons.
First, members of the food group are “aggrieved” parties. To be “aggrieved” for purposes of the APA and to have prudential standing, a party must be “arguably within the zone of interests to be protected or regulated by the statute that he says was violated.” Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, — U.S. -, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (internal quotation marks omitted). The Supreme Court has repeatedly emphasized that prudential standing is a low bar, writing just a few months ago: “The prudential standing test ... is not meant to be especially demanding.... We do not require any indication of congressional purpose to benefit the would-be plaintiff. And we have always conspicuously included the word ‘arguably’ in the test to indicate that the benefit of any doubt goes to the plaintiff. The test forecloses suit only when a plaintiffs interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.” Id. (footnote, citation, and some internal quotation marks omitted).
Importantly, in “determining whether a petitioner falls within the zone of interests to be protected by a statute, we do not look at the specific provision said to have been violated in complete isolation, but rather in combination with other provisions to which it bears an integral relationship.” National Petrochemical & Refiners Ass’n v. EPA 287 F.3d 1130, 1147 (D.C.Cir.2002) (internal quotation marks and brackets omitted); see also Clarke v. Securities Industry Ass’n, 479 U.S. 388, 401, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (“In considering whether the ‘zone of interest’ test provides or denies standing in these cases, we first observe that the Comptroller’s argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act. As Data Processing demonstrates, we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress’ overall purposes in the National Bank Act.”).
Here, analysis of the overall statutory scheme shows that the food group has prudential standing. The Energy Independence and Security Act of 2007 imposes a renewable fuel mandate that requires introducing increasing amounts of renewable fuel into the market every year. See 42 U.S.C. § 7545(o )(2)(B)(i)(I). The Act’s renewable fuel mandate expressly commands EPA to take account of the effect on “food prices” — that is, the price of corn. 42 U.S.C. § 7545(o )(2)(B)(ii)(VI). The balance Congress struck in the renewable fuel mandate thus expressly incorporates effects on food prices. At the same time, another statutory provision — in the same section of the U.S. Code — requires EPA to review and approve renewable fuel additives such as ethanol to make sure the fuel *187 complies with clean air standards. Those statutory provisions together reflect a balance among the interests of corn farmers, the petroleum industry, the food industry, and the environment, among other interests. Because the E15 waiver is necessary — at least in the current market — to effectuate the statutory renewable fuel mandate, and because the food group is explicitly within the zone of interests for the renewable fuel mandate, the food group is in the zone of interests for purposes of this suit.[6]
That conclusion is fortified by the Supreme Court’s decision just a few months ago in Match-E-Be-Nash-She-Wish Band, 132 S.Ct. at 2210-12. There, a residential property owner claimed that the Interior Department violated federal law— the Indian Reorganization Act — when it acquired a parcel of land from someone else for use by an Indian tribe as a casino. See id. at 2202-03. Perhaps needless to say, but the Indian Reorganization Act was not designed to benefit or regulate a property owner who objects when the Federal Government acquires another property owner’s land in order to help Indians. The Supreme Court nonetheless concluded that prudential standing was satisfied. When the “Secretary obtains land for Indians” under this statute, “she does not do so in a vacuum. Rather, she takes title to properties with at least one eye directed toward how tribes will use those lands to support economic development.” Id. at 2211. Although the statute in question “specifically addresses only land acquisition,” decisions under the statute “are closely enough and often enough entwined with considerations of land use to make that difference immaterial.” Id. at 2211-12. “And so neighbors to the use (like Patchak) are reasonable — indeed, predictable — challengers of the Secretary’s decisions: Their interests, whether economic, environmental, or aesthetic, come within § 465’s regulatory ambit.” Id. at 2212.
Here, EPA’s waiver decisions were similarly made with “at least one eye” toward the renewable fuel mandate. EPA acknowledged as much when proposing the E15 waiver. See Notice of Receipt of a Clean Air Act Waiver Application to Increase the Allowable Ethanol Content of Gasoline to 15 Percent; Request for Comment, 74 Fed. Reg. 18,228, 18,229 (Apr. 21, 2009) (“Growth Energy maintains that under the renewable fuel program requirements of the Energy Independence and Security Act of 2007, which is now primarily satisfied by the use of ethanol in motor vehicle gasoline, there exists a ‘blend barrier’ or ‘blendwall’ by which motor vehicle gasoline in the U.S. essentially will become saturated with ethanol at the 10 volume percent level very soon. Growth Energy maintains that a necessary first step is to increase the allowable amount of ethanol in motor vehicle gasoline up to 15 percent (E15) in order to delay the blendwall____ Growth Energy claims that the ‘blendwall’ will make those renewable fuel mandates unreachable and that there are substantial environmental benefits associated with higher ethanol blends.”). Because the renewable fuel mandate in turn specifically takes account of food prices, it is reasonable and predictable to think of members of the food group as proper plaintiffs to challenge these waivers. What this Court said in the decision that was affirmed in Match-E-Be-Nash-She-Wish Band bears repeating: “As a practical matter it would *188 be very strange to deny Patchak standing in this case. His stake in opposing the Band’s casino is intense and obvious. The zone-of-interests test weeds out litigants who lack a sufficient interest in the controversy, litigants whose interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. Patchak is surely not in that category.” Patchak v. Salazar, 632 F.3d 702, 707 (D.C.Cir.2011) (citation and internal quotation marks omitted). So too with the food group here.
Second, even apart from that analysis of Congress’s intent in these ethanol statutes, the food group has prudential standing because it is complaining about an agency’s allegedly illegal decision to loosen restrictions on a competitor of the food group — namely, the petroleum group, which competes against the food group in the upstream market for purchasing corn. Prudential standing does not prevent businesses from complaining about allegedly illegal regulation of their competitors. On the contrary, that has been the precise scenario in several Supreme Court cases where the Court found prudential standing. See, e.g., Clarke, 479 U.S. at 403, 107 S.Ct. 750 (“competitors who allege an injury that implicates the policies of the National Bank Act are very reasonable candidates to seek review of the Comptroller’s rulings”); Ass’n of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153-56, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (sellers of data processing service have prudential standing to challenge decision allowing bank to compete in offering those services). Our cases reveal that business competitors in upstream as well as downstream markets have prudential standing. See, e.g., Sherley, 610 F.3d at 75 (“We conclude the Doctors have prudential standing. The Dickey-Wicker Amendment clearly limits the funding of research involving human embryos. Because the Act can plausibly be interpreted to limit research involving ESCs, the Doctors’ interest in preventing the NIH from funding such research is not inconsistent with the purposes of the Amendment.... [T]hat is all that matters.”). Here, the food group directly competes with gasoline and ethanol producers in the upstream market for purchasing corn as a raw material. Based on those competitor standing precedents as well, the food group has prudential standing.
B
In the alternative, even if the food group does not have standing, the petroleum group does. The petroleum group consists of companies that produce, refine, transport, and store gasoline, ethanol, and gasoline-ethanol blends. Under the statutory renewable fuel mandate, petroleum companies are forced to introduce a significant amount of renewable fuel into the Nation’s gasoline supply. Using only E10 (gasoline with up to 10% ethanol), the petroleum group companies could not meet the statutory renewable fuel mandate. As a result of the E15 waiver in conjunction with the renewable fuel mandate, however, members of the petroleum group now may— and as a factual matter, must — use E15 (gasoline with up to 15% ethanol) in order to meet the renewable fuel mandate. Those businesses will incur considerable economic costs to modify their production, refining, transportation, and storage methods. Those costs are clearly injuries for purposes of standing. The only question here is whether those injuries are caused by EPA’s E15 waiver.
EPA has not challenged the petroleum group’s Article III or prudential standing. Again, I find that silence a telling indicator that the petroleum group has standing. Moreover, the majority opinion does not *189 dispute that the petroleum group has prudential standing. But according to the majority opinion, the petroleum group has not satisfied the causation prong of Article III standing. The majority opinion holds that the petroleum group’s injury is self-imposed and not caused by EPA’s E15 waiver. I disagree.
Causation requires injury that is “fairly traceable to the defendant’s allegedly unlawful conduct.” Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). It is of course true that causation can be defeated by voluntary action — purely self-inflicted injury is not fairly traceable to the actions of another. See PetroChem Processing, Inc. v. EPA, 866 F.2d 433, 438 (D.C.Cir.1989). But causation “is not defeated merely because the plaintiff has in some sense contributed to his own injury”; causation “is defeated only if it is concluded that the injury is so completely due to the plaintiffs own fault as to break the causal chain.” 13A Charles Alan Wright et al. Federal Practice and Procedure § 3531.5 (3d ed. 2008).
To show causation, the petroleum group must demonstrate a “substantial probability” that the E15 will cause at least one of its members to incur higher costs. Sierra Club v. EPA 292 F.3d 895, 899 (D.C.Cir.2002). To be sure, the E15 waiver alone does not require the petroleum group to use E15, make changes, and incur costs. But we cannot consider the E15 waiver in some kind of isolation chamber. The Energy Independence and Security Act imposes a renewable fuel mandate that requires a certain amount of renewable fuel to be introduced into the market every year. Pursuant to that law, an increasing amount of renewable fuel such as ethanol — rising to 36 billion gallons in 2022 — must be introduced into the market. 42 U.S.C. § 7545(o )(2)(B)(i)(I). EPA regulations identify petroleum refiners and importers who produce gasoline as “obligated” parties — they are responsible for introducing a percentage of the required amount into the market each year. 40 C.F.R. § 80.1406; see also 40 C.F.R. §§ 80.1407, 80.1427.
Before the E15 waiver, however, petroleum producers likely could not meet the requirement set by the statutory renewable fuel mandate. Now that EPA has allowed E15 onto the market, producers likely can meet the renewable fuel mandate — but they must produce E15 in order to do so. So the combination of the renewable fuel mandate and the E15 waiver will force gasoline producers to produce E15. In tort law, when two acts combine to create an injury, both acts are considered causes of the injury. So it is here. In the current market, there is at least a “substantial probability” that, in the wake of the E15 waiver, gasoline producers will have to use E15 in order to meet the renewable fuel mandate. And that’s all that the petroleum group needs to show to carry its burden! on the causation issue.
Put another way, the renewable fuel mandate directly regulates gasoline producers and requires them to introduce a certain amount of ethanol. But there was an impediment preventing the producers from meeting that mandate. The E15 waiver removed the impediment, meaning that gasoline producers now will have to use E15 to meet the mandate’s requirements. On those facts, the petroleum group’s injury is not self-imposed, but is directly caused by the agency action under review in this case. For those reasons, the petroleum group has Article III standing to challenge the E15 waiver provision.
The majority opinion concludes otherwise. But the fundamental flaw in the majority opinion’s reasoning is its belief that petroleum producers could meet the renewable fuel mandate without using *190 E15. In the current market, the majority opinion’s assumption is simply incorrect as a matter of fact.
One way to answer the causation question in this case is to ask the following: In the real world, does the petroleum industry have a realistic choice not to use E15 and still meet the statutory renewable fuel mandate? The answer is no, and intervenor Growth Energy’s claim to the contrary seems rooted in fantasy.[7]
As to prudential standing for the petroleum group, EPA does not raise the issue, meaning again that it’s forfeited. In any event, the majority opinion itself does not dispute that the petroleum group is in the zone of interests and has prudential standing. Petroleum producers are directly regulated parties. And parties directly regulated by a statute are within that statute’s zone of interest. Thus, it is undisputed and indisputable that the petroleum group has prudential standing.
II
Having found that there is standing, I turn to the merits of this case. The merits are not close. In granting the E15 partial waiver, EPA ran roughshod over the relevant statutory limits.
Section 211(f)(1) of the Clean Air Act prohibits manufacturers of fuel or fuel additives from introducing new fuels or fuel additives into commerce for use in car models made after 1974, unless the new fuel or fuel additive is “substantially similar” to certain fuels or fuel additives already in use. 42 U.S.C. § 7545(f)(1)(B). All agree that E15 is not substantially similar to fuels already in use. But Section 211(f)(4) allows EPA to waive that prohibition if EPA “determines that the applicant has established that such fuel or fuel additive or a specified concentration thereof, and the emission products of such fuel or fuel additive or specified concentration thereof, will not cause or contribute to a failure of any emission control device or system (over the useful life of the motor vehicle, motor vehicle engine, nonroad engine or nonroad vehicle in which such device or system is used) to achieve compliance by the vehicle or engine with the emission standards with respect to which it has been certified.” 42 U.S.C. § 7545(f)(4) (emphasis added). Put in plain English, in order to approve a waiver, EPA must find that the proposed new fuel will not cause any car model made after 1974 to fail emissions standards.
Here, EPA issued a waiver for E15 even though it acknowledged that E15 likely would contribute to the failure of some cars made after 1974 (namely, those made between 1975 and 2000) to achieve compliance with emissions standards. EPA maintains that E15 will not contribute to the failure of emissions control systems in cars built in 2001 and later. But EPA concedes that E15 likely will contribute to the failure of emissions control systems in some cars built before 2001.
EPA’s E15 waiver thus plainly runs afoul of the statutory text. EPA’s disregard of the statutory text is open and notorious — and not much more needs to be said.
EPA does throw out a few arguments to try to get around the text of the statute. None is persuasive.
*191 First, EPA tries to weave ambiguity out of clarity in the statutory text. EPA contends that the statute does not expressly address partial waivers. But as petitioners aptly respond in their brief, to suggest “ ‘that Chevron step two is implicated any time a statute does not expressly negate the existence of a claimed administrative power (i.e., when the statute is not written in ‘thou shalt not’ terms), is both flatly unfaithful to the principles of administrative law, and refuted by precedent.’ ” Petitioners’ Reply Br. 8-9 (quoting API v. EPA 52 F.3d 1113, 1120 (D.C.Cir.1995)). There is no plausible way to read this statute as allowing partial waivers of the kind granted by EPA here.
EPA also suggests that a plain text reading of the statute would be absurd— “[cjlearly Congress did not mean to require testing of every vehicle or engine.” EPA Br. 23. But that argument confuses methods with standards. As to methods, the statute may allow EPA to test a reasonable sample of vehicles and extrapolate from those results to conclude that a new fuel will not cause any vehicles to fail their emissions tests. But the standard remains that a new fuel cannot cause any vehicles to fail their emissions tests. Just because EPA can restrict its testing to a reasonable sample does not mean that EPA can restrict its waivers to a subset.
EPA then invokes the purpose and legislative history of the waiver statute. With respect to purpose, there is no single purpose to this statute. Like many statutes, this one represents a complex balancing of competing interests and a slew of compromises. Congress did not pursue one purpose at all costs. Cf. Freeman v. Quicken Loans, Inc., — U.S. -, 132 S.Ct. 2034, 2044, 182 L.Ed.2d 955 (2012) (“No legislation pursues its purposes at all costs”) (citation and brackets omitted). Courts respect the legislative process — and the myriad of interests reflected in complex legislation — by hewing to the statutory text and not trying to cherry-pick one purpose from a multitude of overlapping and sometimes conflicting congressional purposes. As to the legislative history, to the extent it’s relevant, nothing in it suggests that Congress intended to allow partial waivers. In any event, as the Supreme Court has repeatedly reminded us, the text of the statute controls. See, e.g., Mohamad v. Palestinian Authority, — U.S. -, 132 S.Ct. 1702, 1709-11, 182 L.Ed.2d 720 (2012); Milner v. Department of the Navy, — U.S. -, 131 S.Ct. 1259, 1266-67, 179 L.Ed.2d 268 (2011). And the text here is straightforward and clear.
EPA separately claims that it has traditionally interpreted the statute as allowing conditional waivers, and that this partial waiver is like a conditional waiver. Even if the statute allows conditional waivers, conditional waivers are not the same as partial waivers. Conditional waivers generally attach conditions to the fuel, but such waivers do not attach limitations on the kind of vehicles that can use that fuel, which is the nature of the waiver at issue here and is precisely what the statute does not permit.
If Congress wanted to authorize this kind of partial waiver, it could easily have said so (and going forward, could still easily do so). After all, the statute elsewhere allows EPA to partially waive other statutory requirements. See, e.g., 42 U.S.C. § 7545(k)(2)(A) (Administrator may “adjust (or waive entirely)” certain emissions requirements); 42 U.S.C. § 7545(m)(3)(A) (Administrator shall “waive, in whole or in part,” oxygenated gasoline requirements that would prevent or interfere with the attainment of certain air quality standards); 42 U.S.C. § 7545(o )(7)(A) (Administrator may waive “in whole or in part” requirements of renewable fuel mandate). But Congress didn’t authorize partial waiv *192 ers in the waiver provision involved in this case.
* * *
The food group petitioners and the petroleum group petitioners each independently have standing to challenge EPA’s E15 waiver. On the merits, EPA’s E15 waiver is flatly contrary to the plain text of the statute. I would grant the petition for review and vacate EPA’s E15 waiver decision. I respectfully dissent.

. Because I find that either of these two groups has standing, I do not address the standing of the engine products group.

. When I refer to the food group and the petroleum group throughout this opinion, I am using shorthand to refer to the many such food and petroleum trade organizations and individual businesses that have sued here. See also Maj. Op. at 174-75 (whether trade organization has standing turns on whether any individual member has standing).

. The APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.” 5 U.S.C. § 702.

. Some older cases from this Court said that prudential standing was jurisdictional. See, e.g., Animal Legal Defense Fund, Inc. v. Espy, 29 F.3d 720, 723 n. 2 (D.C.Cir.1994). But our more recent cases have indicated that prudential standing is not jurisdictional. See American Chiropractic Ass’n v. Leavitt, 431 F.3d 812, 816 (D.C.Cir.2005) (contrasting “the less-than-demanding zone-of-interest test” with "[t]he jurisdictional question”); Toca Producers v. FERC, 411 F.3d 262, 265 n. * (D.C.Cir.2005) (“the prudential standing doctrine, like the abstention doctrine, represents the sort of threshold question that may be resolved before addressing jurisdiction”) (internal quotation marks and brackets omitted); Amgen Inc. v. Smith, 357 F.3d 103, 111 (D.C.Cir.2004) ("That Amgen has prudential standing does not resolve this appeal, however. Another threshold issue is whether the court has jurisdiction to entertain Amgen’s complaint.”); see also Oryszak v. Sullivan, 576 F.3d 522, 527 (D.C.Cir.2009) (Ginsburg, J., concurring) (citing Tenet, 544 U.S. at 6 n. 4, 125 S.Ct. 1230).
To the extent older cases assumed prudential standing to be jurisdictional, that assumption is no longer correct after Supreme Court cases such as Reed Elsevier. There, the Supreme Court expressly “encouraged federal courts” to pay better attention to the distinction between jurisdictional and non-jurisdictional statutory requirements and stated that a statutory limitation generally is jurisdictional only if it speaks to the power of the courts. 130 S.Ct. at 1243-44; see also Gonzalez, 132 S.Ct. at 648 ("Courts, we have said, should not lightly attach those drastic consequences to limits Congress has enacted.") (internal quotation marks omitted); Kontrick, 540 U.S. at 455, 124 S.Ct. 906 ("Clarity would be facilitated if courts and litigants used the label jurisdictional’ not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.”).
I certainly respect Judge Tatel's different view on the status of this Court’s older precedents on this issue. But I believe our duty here is to obey the clear charge given by the Supreme Court rather than to cling to a stale slice of our precedent — precedent which not only has been undermined by subsequent Supreme Court decisions but also has not been followed by our Court in several recent cases.

. To be sure, intervenor Growth Energy has raised prudential standing even though EPA did not. But this Court has repeatedly held that intervenors generally may not raise arguments not raised by the parties. See, e.g., Illinois Bell Telephone Co. v. FCC, 911 F.2d *186 776, 786 (D.C.Cir.1990). There is no reason to depart from that general rule here.
Indeed, the rule preventing expansion of the case by intervenors serves important purposes, especially in our administrative law jurisprudence. The Government as defendant or respondent may want to waive or forfeit certain non-jurisdictional, non-merits threshold defenses so as to permit or obtain a ruling on the merits. In our adversary legal system, an intervenor does not and should not have the unilateral right to thwart the Government's ability to waive non-jurisdictional, non-merits threshold defenses to suit.

. One respected commentator has summarized the Supreme Court's zone of interest precedents as follows: "An injured plaintiff has standing under the APA unless Congress intended to preclude judicial review at the behest of parties in plaintiff’s class.” 3 Richard J. Pierce, Jr„ Administrative Law Treatise § 16.9, at 1521 (5th ed. 2010). The statutes at issue here certainly do not reveal any such "intent to preclude” suits by the food group.

. Under the majority opinion's approach, it appears that a citizen who breathes air (or at least a citizen who has breathing problems) would have standing to challenge the El5 waiver. That's because the E15 waiver will cause emissions that will negatively affect air quality. There is of course no such petitioner involved in this suit. But standing law protects economic interests as well as health interests. And the economic interests of the food and petroleum groups are palpably and significantly affected by the E15 waiver, just as are the health interests of citizens with breathing issues.